## 1882. YOUMANS v. THE STATE.

1. Section 39 of the 6th division of the Penal Code of 1833, as embodied in § 206 of the Penal Code, contemplates fraudulent insolvency, as distinct from the failure of a bank to redeem its bills; and the penalty for insolvency of a chartered bank, caused by the intentional fraud of an officer having charge of its affairs, may be visited upon the officer whose felonious fraud brought about the insolvency, whether the bank has issued bills or not. As to a chartered bank, an allegation either of its insolvency or of its failure to redeem its bills is the statement of a condition which, if shown to exist, raises the presumption that its affairs have been fraudulently mismanaged, and calls upon the defendant (if he is one charged with the administration of its affairs) to show that the insolvency or failure to redeem was not due to his conduct. In the passage of the above-named act it was evidently the intention of the legislature to state two conditions which would raise the presumption that a crime had been committed in the mismanagement of the bank,—either insolvency or failure to redeem its bills.

(a) Section 206 of the Penal Code was not affected by the passage of the act of 1893 (Acts 1893, p. 70), nor by the act of 1898 (Acts 1898, p. 73). It fills a place peculiarly its own, and does not impinge upon any other violations of the banking laws which are penalized.

2. The president and directors of a bank are not punishable for its insolvency, but are criminally liable if the insolvency of the bank has been caused by their intentional fraudulent act. Mere mismanagement, resulting in the insolvency of a bank, is not punishable by law, but the insolvency which indicates intentional fraud or dishonesty on the part of those officers of a bank who are charged with its management, and which can not be otherwise explained after full opportunity for explanation has been given, is properly punishable. The punishment imposed for wrecking a bank is not imprisonment for debt. It is not debt, but fraudulent conduct, which § 206 of the Penal Code seeks to punish. Though, in perpetrating a fraudulent practice upon another, the perpetrator may become a debtor to the person defrauded, it is still within the province of the law to punish him. The bank's insolvency for which the officer having its affairs in charge may be criminally liable is not that which results from mere debt, but that which was caused by fraudulent violation of his fiduciary trust.

3. It is within the power of the legislature to formulate rules of evidence, and, therefore, within the legislative power not only to legalize as evidence a presumption that the insolvency of a bank was caused by the fraudulent act of the officers directly charged with its affairs, but also to place upon such officers the burden of rebutting this presumption. There is no hardship in this rule to the official who has honestly, though unsuccessfully, administered the affairs of a bank.

(a) A constitutional question already answered by previous decisions of the Supreme Court will not be certified, to obtain a repetition of the ruling.

4. The indictment was sufficiently full and definite in its statement to inform the defendant of the offense with which he was charged, and exact

enough to protect him from a second jeopardy. As only fraudulent insolvency is criminal, it should be charged that the bank for whose insolvency the officer may be prosecuted became fraudulently insolvent. A difference exists as between common-law crimes and statutory offenses, in the necessity for fulness of statement in the accusation. Many statutory offenses can be stated in the language of the code; as to many common-law offenses a description of what the defendant actually did is necessary to make the charge plain and legally complete. "Where the offense is purely statutory, having no relation to the common law, it is, as a general rule, sufficient in the indictment to charge the defendant with acts coming fully within the statutory description, in the substantial words of the statute, without any further expansion of the matter," with this fundamental qualification, that the accused must be apprised with reasonable certainty of the nature of the accusation against him, and that an indictment not thus framed is defective even though it follow the language of the statute. United States *v.* Simmons, 96 U. S. 360. There was no error in overruling the demurrer.

Indictment for fraudulent insolvency of bank; from Ware superior court—Judge Park. April 28, 1909.

Argued June 23,—Decided November 9, 1909.

Rehearing denied December 10, 1909.

*W. G. Brantley, L. A. Wilson, W. W. Lambdin, Toomer & Reynolds, F. W. Dart, J. L. Crawley, W. F. Crawley,* for plaintiff in error.

*J. H. Thomas, solicitor-general,* contra.

RUSSELL, J. The plaintiff in error was charged by special presentment with the "offense of a felony, for that the said George R. Youmans, on the twenty-third day of November, in the year of our Lord, one thousand nine hundred and seven, in the county aforesaid, with force and arms and unlawfully, being then and there the president of the Bank of Waycross, a chartered bank incorporated under the laws of said State, and, as such officer of said chartered bank, he being by law charged with the fair and legal administration of its affairs, the said Bank of Waycross, then and there pending and during the said official charge and responsibility of the said George R. Youmans, did then and there be and become fraudulently insolvent, contrary to the laws of said State, the good order, peace and dignity thereof." The defendant demurred to the indictment as being insufficient, and his demurrer was overruled. Failing to have the presentment quashed upon demurrer (which would have effected a final disposition of the case), he excepts to the judgment overruling his demurrer. There are sixteen grounds of the demurrer, but these grounds are treated in the brief of plain-

tiff in error under six heads, stated as follows.   "First: The grounds attacking the construction of the statute as claimed by the State, and showing that said statute relates only to banks of issue. Second:   Grounds attacking said statute because the same was repealed, first, by the constitution of 1868, and second, by the constitution of 1877, prohibiting punishment for debt.   Third: Grounds attacking the said statute because same is in violation of the constitutional inhibition against imprisonment for debt.    Fourth: Grounds attacking the said statute because same was repealed by the act approved December 20, 1893, providing a new code of laws for the circulation of notes by State banks.    Fifth: Grounds attacking said statute and the indictment because in violation of the elementary principle that a union of act and intention or criminal negligence is necessary to constitute a crime, and no one of these elements is alleged against the defendant.    Six: Grounds attacking the sufficiency of the indictment under any and all circumstances, and regardless of the construction given the statute."   We think all of the objections to the indictment which are presented in the demurrer can be summarized under four heads, and shall so discuss them.

1.   The stress of the argument of learned counsel for the plaintiff in error is principally addressed to the point that the provisions of §206 of the Penal Code apply only to banks of issue.    It is sought to support the argument to this effect by a consideration of the origin of the statute now embodied in §206 of the Penal Code, and a view of the conditions then existing, as illustrative of the legislature's intention.    The learned counsel for the plaintiff in error urge with much force that at the time the act of 1833 was passed, nearly all, if not all the banks of this State, were banks of issue; and it is true that most of the decisions of the Supreme Court upon this and kindred subjects deal with banks of issue.    As we now have no banks of issue, it is contended that §206 has become obsolete, if indeed it is not completely repealed by the passage of the acts of 1893 and 1898.   We are unable to concur in this view. . While that construction of a statute is to be preferred which will preserve all the parts of the enactment under consideration, it is nevertheless a cardinal rule of construction that the legislative intent shall be effectuated, even though some of the verbiage of an enactment may have to be eliminated from the text.    We

fail, however, to see any difference in conditions in construing the act as a whole, whether the law be considered in the light of the conditions surrounding it at the time of its passage, or of those existing when it was incorporated in the present code in 1895. And even the very learned and ingenious argument of counsel fails to convince us that the act is intended to operate only upon banks of issue. The language of the statute under which the defendant was presented (Penal Code, §206) is as follows: "Bank insolvency deemed fraudulent. Every insolvency of a chartered bank, or refusal or failure to redeem its bills on demand, either with specie or with current bank-bills passing at par value, shall be deemed fraudulent, and the president and directors shall be severally punished by imprisonment and labor in the penitentiary for not less than one year nor longer than ten years: *Provided,* that the defendant may repel the presumption of fraud, by showing that the affairs of the bank have been fairly and legally administered, and generally with the same care and diligence that agents, receiving a commission for their services, are required and bound by law to observe; and, upon such showing, the jury shall acquit the prisoner." Now, at the time when the Penal Code of 1833 (from which §206 of our present Penal Code was taken) was adopted by the passage of the act approved December 10, 1833 (39th section, 6th division, Acts 1833, p. 165), as well as when the act of 1838 was passed, and at the period when most of the decisions upon the subject were rendered, it is true that the banks chartered by the State were largely banks of issue. But we can not, on this account alone, concur in the argument of counsel for the plaintiff in error that the act in question, even at that time, was intended to relate only to banks of issue, nor hold, as contended for by counsel, that the language "refusal or failure to redeem its bills on demand" was used in the act merely as a definition or explanation of what the legislature meant by the word "insolvency." It is significant that in the 44th section of the 6th division of the Penal Code of 1833 (Acts 1833, p. 165), reference is made to the 39th section of the 6th division of the act, which is now §206 of the Penal Code. And we think this reference and the language employed therein alike show that it was not the intention of the legislature to treat the failure to redeem bills on the part of the bank as synonymous, in a criminal sense, with insolvency, although, so far as a civil lia-

bility was concerned, a failure to redeem its bills might be a badge of insolvency. And certainly the language of §44 of the 6th division of the Penal Code plainly shows that as to the bank there might be criminal insolvency apart from the insolvency indicated by failure to redeem its bills. The act of 1838, as its title indicated, was merely "An act to authorize the business of banking and to regulate the same." Acts 1838, p. 33. It contains no reference to any penalty against the officials of the bank. It is true that the failure or refusal to redeem bills of the bank might indicate insolvency on its part, but it would not necessarily have followed, even if a bank redeemed all of its bills, that it was not insolvent. The bills referred to in the act do not refer to nor include necessarily all of the indebtedness of the bank, for the word "bills," as used at the time of the passage of the act (and especially in reference to banks issuing currency), as construed by our Supreme Court, referred to the currency issued by the bank, and not to its general indebtedness. In *Dougherty* v. *Western Bank,* 13 *Ga.* 296, Judge Nisbet, delivering the opinion, says: "Bank bills subserve the purposes of money in the ordinary dealings of the people. They constitute the circulating medium of the country. They constitute its currency." And stress is laid on the absolute necessity, as a paramount object of interest and duty, of maintaining confidence in them as such. At the period when these banks were issuing bills it was possible for a bank to issue an amount of bills far less than its assets; and, therefore, it might have refused to redeem its bills, and yet not have been insolvent in the popular sense. On the other hand, it might have issued a quantity of bills, either large or small, and, either from its own assets or by borrowing money to redeem them, might have redeemed every single bill issued by the bank, and yet have been unable to respond to the demands of its depositors or other creditors, and consequently have been insolvent. For this reason we do not see that the refusal or failure to redeem its bills, which the statute provided should be deemed fraudulent and criminal, has any necessary connection with or qualifies in any degree the fraudulent insolvency of a chartered bank, which it was likewise provided should raise a presumption that the insolvency was produced by fraud. Each of these conditions, if shown to exist with reference to a chartered bank, raised the presumption that its affairs had been fraudulently mismanaged, and called upon the de-

fendant to rebut this presumption. If the contention of the plaintiff in error is sound, then there was no law, at the period when banks were issuing currency, against the failure of a bank to redeem its bills (no matter what financial catastrophe might have resulted from intentional delay), unless it could be proved that the bank in question was really insolvent. On the other hand, if a bank, having issued only a small quantity of bills, should use its depositors' money to redeem them, and at the same time be absolutely insolvent, there would be no penalty for this misapplication of the funds intrusted to its care.

We conceive that the purpose of the act was to throw the very strongest possible safeguard around the rights and interests of those dealing with banks, as well as the public generally, and that it was the intention of the legislature to state not merely one condition of affairs upon this point which would raise the presumption that a crime had been committed in the management of the bank, but two,—either insolvency or failure to redeem its bills. And this is nothing new in criminal statutes. It has come to be a fixed rule that where a crime can be committed in more ways than one, the defendant must be informed of the manner in which he is charged to have committed the offense named.

The acts of 1893 and 1898 had no effect upon §206 of the Penal Code. Repeals by implication are not favored. But there is nothing from which it can be implied that there was any intention on the part of the legislature, in the passage of the acts of 1893 and 1898, to change the subject-matter of §206 of the Penal Code. The only criminal penalty imposed by the act of 1893 (Acts of · 1893, p. 70) is directed to violations of the 6th, 20th, and 21st sections of the act. These sections, of course, apply only to those banks that may see proper to avail themselves of the privilege of issuing bills, and, even as to such banks, would not cover either a fraudulent insolvency or a failure to redeem bills, considered as crimes. Consequently the act of 1893 can not be said' to trench upon the territory covered by so much of the act of 1833 as is now §206 of the Penal Code. The act of 1898 (Acts of 1898, p. 73 et seq.) was merely an attempt to give force to the previous enactment of 1893; and the only penal liability imposed in this act was as to the governor, the treasurer, and the comptroller-general. ·Certainly there is nothing in these acts that could be said, even by

implication, to repeal §206 of the code, or to refer to the subjects embraced in that section, except that if it happened that a bank (having issued its bills under the provisions of the act of 1898) should fail to redeem its bills, its officers would be liable to the penalty imposed by §206 of the Penal Code. These acts were designed simply to enable banks chartered by the State to test the validity of the Federal statute which prescribed a tax of ten per cent. on any bills issued by State banks. It can not be supposed that §206 was incorporated into the code by the General Assembly of 1895 without knowledge on its part of the passage of the act of 1893, two years previous. And before we could decide that §206 was repealed by implication, or that it is obsolete, as argued by counsel for plaintiff in error, it would have to appear that either the passage of an act antagonistic to its purposes, or the existence of conditions which rendered it completely useless and superfluous, had nullified that vigor and renewed strength which might be implied from its re-enactment in the code in 1895. There was as much reason in 1895 (and is now) as in 1833 for the presumption to arise that the insolvency of a chartered bank was due to the fraud of its management; and it was possible in 1895 for any chartered bank in the State to be a bank of issue by complying with the requirements of the Federal law and paying the tax of ten per cent. upon its issue, even if in no other way. Furthermore, as part of the history of the State, we know that there has several times been a demand on the part of the General Assembly for the repeal of the ten per cent. tax on the issue of State banks, and it is quite possible that the legislature may have left intact that portion of the statute which relates to the refusal to redeem bills, in contemplation of the fact that this tax might be repealed. No matter what may be the purpose or effect of that portion of §206 which declares failure or refusal to redeem its bills to be an act from which a presumption may arise that the directors of a bank have fraudulently conducted its affairs, the fact remains that the insolvency of the bank, if the bank be chartered, whether it issue bills or not, is sufficient to raise such a presumption. And in our opinion it should be sufficient for that purpose if the interest of those dealing with the banks is to be safeguarded. Properly managed, a bank should not become insolvent. When one does become insolvent, it is adjudged a case of res ipsa loquitur,—the thing itself speaks of

bad management. It is not necessarily evidence of fraud, but, under the provisions of the statute, it raises a presumption that there has been fraud, and casts the burden upon the defendants to show that the failure was honest. It was thought by the General Assembly that unless there were some such provision as that embodied in §206, there might be numerous instances where the insolvency of the bank had been recklessly or intentionally produced by fraud, for which there would be no penalty. The counsel for the plaintiff in error state a hypothetical case, in which it is supposed that, the cashier having robbed the bank, its insolvency was due to that fact only, and asks the question, "Would any court in Christendom hold that the president or some director of the bank, in no way privy to the robbery, becomes thereby a criminal?" It is plain that though, upon the insolvency of the bank being shown, the presumption would arise that the president and directors are chargeable therewith, this presumption would be very easily rebutted if it were shown that its insolvency was caused by a robbery, either by an outsider or by the cashier, as in the hypothetical case proposed. And yet, on the other hand, if the State were required to allege and prove the particular act that might have caused the insolvency, no matter how fraudulent it might have been, a successful prosecution would be well-nigh impossible.

2. The demurrer attacks the presentment upon the ground that §206 has been repealed by the constitution of 1868 and the constitution of 1877, prohibiting imprisonment for debt. We see nothing in this point, for the reason that it is not debt, but fraudulent conduct, which the statute seeks to punish. The president or director whose mismanagement is alleged to have brought about the insolvency of the bank may be perfectly solvent personally, or he may be insolvent. It would not matter which. It is the insolvency of the bank, and not of the director, which is in question, and whether that insolvency was caused by his fraudulent act, not in the conduct of his own business, but in violation of his trust as a fiduciary. And such a director, if punished because he was unable to rebut the presumption by showing that he had done his duty in the conduct of the bank's affairs, would not be punished for debt (especially not for his individual debt), but for a felonious fraud. The principle is clearly stated in *Lamar* v. *State*, 120 *Ga.* 312 (47 S. E. 958), where, in upholding the act of August 15, 1903, in

reference to contracts for the performance of labor, the Supreme Court said: "The General Assembly can not, under the guise of a statute creating a criminal offense, imprison one who has failed to pay a debt; but if one in becoming a debtor perpetrates upon another a fraudulent practice, it is not beyond the province of the lawmaking power to denounce as a crime the fraudulent practice and imprison him who has been guilty of the practice, notwithstanding he may be at the same time under the obligation of a debtor to him upon whom the fraud was perpetrated." See also *Mulkey* v. *State*, 1 *Ga. App.* 521 (57 S. E. 1022). It is plain that as the insolvency referred to in §206 of the Penal Code is only a fraudulent insolvency (because the accused in every case is permitted to show that the insolvency was not due to fraud), that section is aimed at the fraudulent practice by which the bank was rendered insolvent, and has no reference whatever to debt or the failure to pay back the money obtained. There is no similarity between the provisions of §206 and the Alabama and Tennessee statutes to which reference is made in Carr *v.* State, 106 Ala, 35 (17 So. 350, 34 L. R. A. 634, 54 Am. St. R. 1), and State *v.* Paint Rock Coal & Coke Co., 92 Tenn. 81 (20 S. W. 499, 36 Am. St. R. 68).

The undertaking of a bank to refund to depositors or to pay their indebtedness is a mere contract. Failure to perform such a contract can not be penalized, but it is certainly within the power of the General Assembly, under the decision in the *Lamar* case, supra, to penalize a fraudulent practice whereby not only may the bank be rendered unable to perform its contract, but, as a result thereof, great distress may be caused to those who trusted in its solvency and proper management. The bank's insolvency itself would constitute no crime, if it appeared upon the trial that there was an honest failure; but if fraudulent practices were the cause of the bank's insolvency, they can be punished, and should be. In *Banks* v. *State*, 124 *Ga.* 15 (52 S. E. 74, 2 L. R. A. (N. S.) 1007), it was held that "the purpose of the act of 1903, as indicated on its face, is to make criminal and punish certain fraudulent practices, not to enforce imprisonment for debt; and it is not in conflict with the provision of the constitution which declares that there shall be no imprisonment for debt." In the *Banks* case precisely the same question was raised as to the "labor-contract act" of 1903 (Acts

1903, p. 90), as is here attempted to be presented in regard to §206, and (it would seem) with more reason, for the act provides, in its second subdivision, that if any person, after having contracted to perform service of any kind with another, shall procure from the hirer money or other thing of value, with intent not to perform such service, to the loss and damage of the hirer, he shall be deemed a common cheat and swindler and punished accordingly, and yet provides that if the money so advanced, with interest thereon, is returned at the time the labor is to be performed, the employee shall be guiltless. In ruling upon the suggestion that the act of 1903 was unconstitutional because violative of the inhibition against imprisonment for debt, the Supreme Court in that case held, that "The contention that this act is unconstitutional on the ground that it is an attempt to enforce imprisonment for debt is settled by the decision in *Lamar* v. *State* [supra]. On the face of it, the purpose of the act is to punish fraudulent practices, not the mere failure to pay a debt. Thus considered, it is constitutional. Otherwise, it would not be so. And we will not presume an unconstitutional purpose on the part of the legislature, where the act is readily capable of a construction harmonizing with the constitution."

3. One of the strongest grounds presented by the demurrer, and one ably argued by counsel for the plaintiff in error in their brief, deals with the presumption, arising from mere proof of insolvency of the bank, that the insolvency was caused by fraudulent practice on the part of its president or directors. The same question was presented in the *Banks* case, supra, where it was raised as a constitutional question. In discussing this phase in the *Banks* case, Judge Lumpkin says, as to the second section of the act of 1903 (which declares that satisfactory proof of the contract, the procuring thereon of money or other thing of value, the failure to perform the services so contracted for, or failure to return the money so advanced, etc., shall be presumptive evidence of the fraudulent intent) : "This is not an assumption of judicial functions by the legislature. It declares a rule of evidence under which certain acts are deemed presumptive evidence of a fraudulent intent in committing them. The legislature has power to establish rules of evidence." And after reciting a number of instances which afford the basis for presumptions, both in civil and criminal cases,

Judge Lumpkin proceeds to say: "An act quite similar to that under consideration will be found in the Penal Code, §206, which provides that every insolvency of a chartered bank, or refusal or failure to redeem its bills on demand, shall be deemed prima facie fraudulent; but the president or any director who may be prosecuted may repel the presumption of fraud." See also *Vance* v. *State,* 128 *Ga.* 668. The similarity of the two cases is so apparent, and the ruling upon the act of 1903 is so applicable to §206 of the Penal Code, that we deem it unnecessary to certify any question to the Supreme Court. *Rose* v. *State,* 4 *Ga. App.* 610 (62 S. E. 117) ; *Tooke* v. *State,* 4 *Ga. App.* 495 (61 S. E. 917). The Supreme Court having already recognized the similarity of §206 to the act of 1903, the decision would necessarily be in accord with what we now rule. It will be noted that in referring to that section Judge Lumpkin separates the insolvency of a chartered bank from its refusal or failure to redeem its bills, just as we have done, thus denying the contention of the plaintiff in error that the refusal to redeem the bills of the bank is only explanatory of what is meant by insolvency, and showing that insolvency, whether caused by the issuance of bills or otherwise, or whether it is the insolvency of a bank which has never issued any bills or not, may of itself give rise to the presumption that the president or directors, or both, have fraudulently mismanaged the affairs of the bank.

4. Several grounds of the demurrer may be summarized under one head, though each alike presents the contention that the presentment is fatally defective under any circumstances. We think that the indictment properly charges "fraudulently insolvency." It is an insolvency which has resulted from fraud and was brought about by fraud. An insolvency which has not originated in fraud can not afford a basis for a conviction. It is true that the statute says the insolvency shall be deemed fraudulent; and it is only insolvency that the State is required to prove in making a prima facie case,—that is, insolvency being shown, and nothing more, it is presumed that the insolvency was fraudulent, because it ought to be presumed that if there was no fraud there would be no insolvency. But as fraudulent insolvency alone is punishable, it devolves upon the State, in making a charge, to allege it is such. Upon the proof, insolvency, aided by the statutory presumption which has been

stated, is in the nature of a res ipsa loquitur, and establishes a fraudulent insolvency, unless by proper explanation the defendant rebuts the presumption; in which case the fact of insolvency becomes innocent and unimportant. The writer has always favored giving a defendant, by means of the statements in the accusation against him, the fullest opportunity of defending himself, and believes that the indictment or other accusation should put the accused upon such notice as that he can not only prepare his defense, but also have the offense so definitely described as that the judgment will protect him from a second jeopardy. We think that to hold that the indictment in this case (which is practically in the words of the statute) is sufficient does not deprive the defendant of any right in either regard. From the allegation there made the accused would know as much that he was charged with the insolvency of the bank as if pages were used in the effort to elucidate that statement. The words "insolvency" and "insolvent" are words of general use and obvious meaning. To say that a bank is insolvent is simply to say that all of its assets are insufficient to meet its liabilities. If an officer of a bank is accused, under §206 of the Penal Code, and it is proved that the bank is in that condition in which all of its assets are insufficient to discharge its debts, and that the officer on trial is one charged with the management of the bank's affairs, this is all that the statute requires of the prosecution in the first instance; and therefore an indictment alleging these facts and that the insolvency is fraudulent is sufficient to put the defendant on notice of the nature of the charge against him, and to inform him fully that he is expected to show, in rebuttal of the presumption above mentioned, that the insolvency alleged is due to no misfeasance upon his part. In *Wingard* v. *State,* 13 *Ga.* 400, the Supreme Court gives the purposes in requiring particularity in setting out an offense to be: "First, in order to identify the charge, lest the grand jury should find a bill for one offense, and the defendant be put on trial in chief for another. Secondly, that the defendant's conviction or acquittal may inure to his subsequent protection, should he again be questioned on the same grounds. Thirdly, in warranting the court in granting or refusing any particular right or indulgence incident under the law of the case. Fourthly, to enable the accused to determine on the line of his defense and prepare for it, both as to the

law and facts.    And, fifthly and finally to put it in the power of the court to look through the record and decide whether the facts charged are sufficient to support a conviction for a particular crime and to warrant the judgment; also to regulate the appropriate punishment for the particular offense."

In construing § 929 of the Penal Code, in the case of *Amorous* v. *State*, 1 *Ga. App.* 313 (57 S. E. 1000), we said, "it means that an indictment conforming substantially to its requirements will be sufficient, but it is not designed to deny the one accused of crime the right to know enough of the particular facts constituting the alleged offense to be able to prepare for trial."    It is true, as stated by counsel for the plaintiff in error, that "there are many offenses that can be stated in the language of the code, such as playing cards, selling liquor, or carrying a pistol concealed; there are many other offenses that would not be sufficiently charged if stated merely in the language of the code, such as murder, larceny, perjury, etc.    A description of these latter offenses or a description of what the defendant did is necessary to make a legal charge, and to enable the defendant to prepare a defense."    A distinction is to be drawn between charges which are violations of purely statutory offenses and those cases which were penalized under the common law.    Naturally, where the offense is statutory, the language of the accusation must follow more closely the language of the statute, and be restricted by it more, than where the charge relates to a common-law offense, in which the details must necessarily be amplified in order to cover the definition of the common law offense.    Reference is made to this difference in United States *v.* Simmons, 96 U. S. 360 (24 L. ed. 819), in which the court said: "Where the offense is purely statutory, having no relation to the common law, it is, as a general rule, sufficient in the indictment to charge the defendant with acts coming fully within the statutory description, in the substantial words of the statute, without any further expansion of the matter."    "But to this general rule there is the qualification, fundamental in the law of criminal procedure, that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defense and plead the judgment as a bar to any subsequent prosecution for the same offense."    "An indictment not so framed is defective, although it may follow the language of the statute."    All

the material facts and circumstances embraced in the definition of a statutory offense must be stated, or the indictment will be defective; and no essential element of the crime can be omitted. But it is sufficient if the statement of the facts and circumstances is such as will inform the defendant of the specific offense with which he is charged. This doctrine is recognized in United States v. Hess, 124 U. S. 483 (8 Sup. Ct. 571, 31 L. ed. 576), cited by counsel for the plaintiff in error. To illustrate: it would not have been sufficient, in the present case, to have charged the defendant with a felony due to the fraudulent insolvency of a bank whose affairs he was charged with conducting, although this would conform generally to the language of the statute; but when it is alleged that the Bank of Waycross (which is stated to be a chartered bank) became insolvent, and it is further alleged that the insolvency was fraudulent, and that the condition of insolvency arose during the defendant's official charge and responsibility, every specific fact essential to put the defendant on notice of the accusation which he is called on to defend, and necessary to his proper defense, has been set out; this for the reason that everything has been stated which it would be necessary for the State to prove in order to establish a prima facie case. And the provision of the section in which it is declared that "the defendant may repel the presumption of fraud, by showing that the affairs of the bank have been fairly and legally administered, and generally with the same care and diligence that agents, receiving a commission for their services, are required and bound to observe," is a matter of affirmative defense, and therefore, under well-settled rules, need not be negatived. The only objection that can be made to the statute which is now incorporated in §206 of the Penal Code, and which we hold to have been properly reinvested with new force and vigor by its incorporation into the code in 1895, is to the rule of evidence by which, upon proof of the insolvency of a bank while under the direct supervision and control of its officers, the presumption arises that such insolvency was due to fraud on the part of these officers; and we see no hardship in the creation of this presumption, in view of the interests at stake on the one hand, and the helplessness of those who may be wronged to produce proof which is absolutely within the power of those having the bank in charge. Under our modern civilization, those banks which by years of dealing have acquired

the confidence of the public become the depositories of the funds of thousands who are not engaged in active business, and funds of widows and orphans who are, in a sense, the wards of the State. With every confidence in their solvency, the thrifty laboring man deposits in these banks the small savings by means of which he hopes at length in old age to rest from his labors, under his own vine and fig tree. The banking business is in the nature of a public trust. While a general depositor is merely a creditor, still, if the bank be looted by its own officers, the depositors become more than creditors in the eyes of the criminal law. To put upon the prosecution in a case where a bank has become insolvent through the fraud and corruption of its officers the burden of proving one or more definite transactions in which the bank was fraudulently despoiled or fraudulently mismanaged, together with the burden of charging and proving the details of the individual transactions, when all the proof is in the possession and control of the defendant, was not considered by the General Assembly as sound sense or sound law. And yet, if the insolvency of the bank was due to misadventure or misfortune, nothing would be easier than for those in charge of its affairs to establish that fact; and in this event the significant language of §206 of the Penal Code is that they "shall be acquitted." As we see it, there is nothing radical in the rule of evidence embraced in §206, and certainly nothing unfair to those officers of a bank who may have honestly, even though unsuccessfully, administered its affairs. We find no error in the overruling of the demurrer, upon any of the grounds suggested thereby. *Judgment affirmed.*