## HARRISON *et al v.* ODUM *et al.*

1. "The marriage of the mother and reputed father of an illegitimate child,
   and the recognition of such child as his, shall render the child legiti-
   mate, and in such case the child shall immediately take the surname of
   his father."
2. The evidence in this case was sufficient to authorize the trial judge to
   find that the reputed father and the mother of the children born out
   of lawful wedlock were subsequently married, and that the father recog-
   nized the children as his own; and to order that the status of the
   property involved be preserved until a jury may pass upon the evidence
   under proper instructions.

No. 883. OCTOBER 17, 1918.

Injunction. Before Judge Highsmith. Glynn superior court.
February 8, 1918.

This case involves the estate of Nelson H. Harrison, who died
in Glynn county in July, 1917, in the 90th year of his age. The
plaintiffs in the court below were Mrs. Martha Odum and the chil-
dren of William Henry Harrison, who predeceased Nelson H.
Harrison. The defendants were the other children of Nelson H.
Harrison, namely, Robert Harrison, Frank S. Harrison, and Nel-
son C. Harrison, and the children of James B. Harrison, a de-
ceased son of Nelson H. Harrison. The National Bank of Bruns-
wick, which had on deposit more than $13,000 in the name of
Nelson H. Harrison at the time of his death, was also made a
party defendant, as was James R. Thomas, temporary administrator
of the estate of Nelson H. Harrison. The petition made substan-
tially the following allegations: Mrs. Odum was a child of Nelson
H. Harrison, and the other plaintiffs were children of William H.
Harrison, a deceased child of Nelson H. Harrison, and all the
plaintiffs were heirs at law of Nelson H. Harrison, deceased. Soon
after the death of Nelson H. Harrison the defendants conspired

to divide among themselves, his estate (of the value of $35,000 or $40,000), to the exclusion of the plaintiffs, and they divided among themselves the real property, having exchanged deeds for that purpose on August 13, 1917, in which it was recited that they were the sole heirs of Nelson H. Harrison, deceased. They also distributed among themselves all of the personal property of which they could get possession and appropriated it to their respective uses, leaving only the deposit in the bank, which is represented by a time certificate to mature about January, 1918. The defendants endeavored to get the bank to pay the deposit before it was due, insisting, in an affidavit of August 13, 1917, that they were all of age and were entitled to it as the sole heirs at law of Nelson H. Harrison. The bank declined to pay the certificate, and notified the affiants that they would have to take out letters of administration upon the estate of Nelson H. Harrison. A temporary administrator (James R. Thomas) was accordingly appointed in November, 1917. The plaintiffs prayed: that a decree be rendered, establishing the status of themselves as heirs at law of Nelson H. Harrison, deceased, declaring who are his other heirs at law, and ascertaining and fixing the part of his estate to which each is entitled; for an accounting by the defendants for the personal property appropriated by each, and fixing the value thereof; for cancellation of the deeds of August 13, 1917, interchanged among the defendants; for marshaling the assets of the estate, and administration and distribution thereof among those entitled; for an awarding to the plaintiffs, out of the deposit in the bank, of such amounts as may be necessary to equalize their respective shares of the personal property with the shares of the other defendants in accordance with the accounting; for a sale, if necessary, of the real property of the estate; that the defendants be enjoined, pendente lite, from doing any act or thing which would interfere with or disturb the bank deposit, and that the bank be enjoined from paying the deposit to the other defendants; that the defendants be enjoined from disturbing the status of the lands conveyed by the deeds of August 13, 1917, and from cutting or removing any timber therefrom; for the appointment of a receiver, etc. The parties reached an agreement, pending the litigation, with respect to the management of the affairs of the estate, that obviated the necessity of a ruling by the court on the prayer for appointment of a receiver.

The defendants filed their answer. They deny that the plaintiffs are heirs and distributees of the estate of Nelson H. Harrison, and aver that the defendants are the sole and exclusive heirs, and that the equitable relief sought by the plaintiffs should be denied. They admit that they have divided certain property belonging to the estate of the deceased among themselves, but aver that they had a right to do so, as they were the children and heirs of the decedent. The court made an order enjoining the defendants from selling or offering to sell, or from incumbering or disposing of any of the property belonging to the estate of Nelson H. Harrison, etc. To this judgment the defendants excepted.

*James R. Thomas,* for plaintiffs in error.

*Bennet, Twitty & Reese,* contra.

HILL, J. Did the trial court err in granting the injunction and in preserving the status of the estate of Nelson H. Harrison pending the litigation? The answer to this question depends upon the answer to another controlling question involved in the case, namely, whether Mrs. Odum, one of the plaintiffs, and her deceased brother, William Henry Harrison, who was the father of the other plaintiffs, became the legitimate children of Nelson H. Harrison, deceased, or whether they were illegitimate children. It is insisted upon the part of the plaintiffs in error, who are admittedly legitimate children of Nelson H. Harrison, that about the year 1852 Eliza Strickland, the mother of Martha Odum and the grandmother of the other defendants in error, was living in the house with Richard Bennett in Wayne county, about twenty miles from the home of Nelson H. Harrison, and that while Eliza was thus living she, being unmarried, gave birth to twins, one of whom was named Martha and the other William Henry. Eliza Strickland and her two children remained in the home of Richard Bennett until Nelson H. Harrison finally went to the home of Bennett and carried Eliza and the two children to his home in Glynn county, Georgia. It is contended by the plaintiffs in error that under the evidence Martha and William Henry were illegitimate children, and therefore that neither they nor their children were heirs at law of Nelson H. Harrison and could not inherit from his estate.

Section 3012 of the Code of 1910 declares: "The marriage of the mother and reputed father of an illegitimate child, and the recognition of such child as his, shall render the child legitimate; and

in such case the child shall immediately take the surname of his father." How stands the instant case as to this? On the hearing the plaintiffs read the affidavit of. Martha Odum, one of the plaintiffs, which was substantially as follows: Before her marriage she was Martha Harrison, the daughter of ˏNelson H. Harrison and Eliza Harrison, his wife, both of whom are now dead. Her earliest recollection was when she was living with her father and mother and their children at a place about 3 or 3 1/2 miles from Waynesville. Her father and family continued to reside at this place until after the war, when he moved to Glynn county. According to her information she was born August 26, 1852. She had a twin brother, William Henry Harrison, who died about 10 years ago. She was raised in her father's (Nelson H. Harrison's) house and lived there until she was about 18 years old. At this time a young man by the name of Page Lewis asked her to become his wife, and she consented to do so. Lewis asked her father's permission to marry her, but ˑ"he [Harrison] flew into a rage and started after said Lewis to beat him, and ran Lewis off the place." Her. father whipped her because he was so displeased at her wanting to marry Lewis. The result of this was that deponent left home and spent the night with her uncle, John Harrison, a brother of Nelson H. Harrison. She remained at John Harrison's about two days, when her mother took her to Mrs. Mumford's at Waynesville, where she stayed for more than 9 months. She later lived 5 months at the home of a Presbyterian preacher by the name of Quarterman. She then lived ˑwith her aunt, Mrs. John Manning, for 5 or 6 months until she married Leonard Odum. While she lived with Mrs. Mumford she and her father became reconciled, and she went back and visited him several times and continued to pay visits to his home until the time of her marriage. Her father knew nothing of her intended marriage to Odum until shortly before it occurred. Her father was angry with her for marrying Odum, but did not remain angry long. She recalls that she visited her father and mother within a year, and it was not long before her father and mother came to see here at her home, and from that time on to the time of her father's death she went to see him regularly and he would come to see her. After her marriage to Odum she learned that her father was opposed to her marriage because Odum drank. When she would visit her father and he would visit her,

he would give her a few dollars, and generally would make a statement like this: "Well, Martha, it's no use to give you much, for your husband would drink it up; later I will give you some land at Hortense." But he never gave deponent the land. About 5 years ago deponent's husband left her, and before doing so he sold off practically all the household goods deponent had, and left her without necessary furniture in the house. In this trouble she went to her father, and he gave her $25. Even after her father was a very old man, and during the last 12 or 15 years of his life, and after his wife, deponent's mother, had died, he came to see her a number of times and would spend a night or two at her house. On these visits he would always give deponent or her children money, or would bring clothes for the children or provisions "to help deponent out." From her earliest recollection until his death her father was kind and considerate of her, except during the periods when she was a young woman and wanted to marry against his wishes. After deponent was a grown woman, and after she was married and had children of her own, her mother told her one day substantially the following: "Martha, I reckon I ought to tell you that when me and your father were married, you and Henry were already born and were just learning how to walk by catching hold of chairs and such things." This was the only time her mother ever referred to this fact to deponent or in her presence. Her father never made reference to it to deponent or in her presence. From her earliest recollection to the time of her father's death he always treated her as a daughter and her twin brother as a son. He frequently referred to deponent as his daughter and her twin brother as his son, and in speaking to her, and usually when speaking to Henry he would address him, "Henry, son," and in speaking to others he almost invariably said "my son Henry." All the rest of her father's children have always called her "Sis," including Robert Harrison. Their children have always called her "Aunt Martha." She has frequently heard her father say that Henry was the best son he ever raised, that he was always ready to do for him. He seemed to be his favorite. Her father frequently told her of having given Henry Harrison a place on Hatcher island and some cattle soon after Henry Harrison married. Henry Harrison has often told deponent the same thing. Her father has also told her about the land he gave his other chil-

dren, and would always add that he was going to give her some later, but would say that it was no use to give her any then, because her husband would drink it up. When her father would be at her home, in speaking to her children he would usually refer to himself as "grandpa"; for instance, if he wanted to take one of them in his lap, he would say, "Come and get in your grandpa's lap." Deponent's children have spent a great deal of time at the home of Nelson H. Harrison at his invitation. During all the time she spent in her father's home while she was growing up and in visiting there after she left, she has frequently heard her father and mother "have disputes like husband and wife generally do, but she never in all her life heard him say one word to or about his wife reproaching her for having had children before she was married or anything of the kind. She never heard him reproach his wife with any charge that she and her brother Henry were not his children."

The affidavit of Mrs. Emily Harrison, the widow of William Henry Harrison and the mother of all the defendants in error, except Mrs. Odum, was substantially to the same effect as the affidavit of Mrs. Odum. She also deposed that deponent's mother was a sister of Nelson H. Harrison, and that deponent's family lived near to Nelson H. Harrison, deceased. All of her life deponent lived near to Nelson H. Harrison. When she could first remember, his family consisted of his wife, Eliza, and four children, Robert, William Henry, Martha, and Jane Anice. Deponent knows from family repute that her husband was born on August 26, 1852. After deponent first knew Nelson H. Harrison's family other children were born to him: James B. Harrison, who is now dead, Nelson C. Harrison, and Frank S. Harrison. All of these children were by his wife, Eliza, who was his second wife. She was Eliza Strickland before her marriage. His first wife was Hettie Burgess, and by her he had only one child, Robert Harrison. Robert Harrison was born in November, 1852. His mother died when he was a few weeks old, and deponent's mother nursed him and deponent together. During all the time deponent knew Nelson H. Harrison and his family he always treated her deceased husband, William Henry Harrison, and his twin sister, Martha, as his children. They grew up in his household and bore his name, from deponent's earliest recollection. Nelson H. Harrison always

referred to them as his children up to the time of his death. Whenever he spoke of deponent's husband he invariably referred to him as "my son, Henry," and when he spoke to him he usually addressed him as "Henry, son." Nelson H. Harrison gave her husband a place known as "Hatcher's island," and 18 head of cattle. He gave Robert, another son, a like number.

The proof shows, that Nelson H. Harrison, before the birth of Martha and William Henry, was a visitor to the home where Eliza Strickland lived, and sometimes spent the night; that just prior to the time he married Hettie Burgess, and before Eliza's children were born, his visits to Eliza ceased; that no other man visited Eliza, so far as the evidence goes; that about three months after the birth of Eliza's children, Harrison's first wife (Hettie) had a child (Robert) and died within a few weeks thereafter; that Harrison soon after his wife's death renewed his visits to Eliza, who at that time had illegitimate twins; that he soon married her and took her and her children to his home, where he had other children by her, two of whom are still living, and, with the children of a deceased child by Eliza, are parties defendant in this case; that he gave Eliza's first children his name; that they were reared in his home and were recognized as his children and he treated them as such; that Nelson H. Harrison mourned William Henry's death as his child, and aided his widow and his children after his death; that up to the time of his death he regarded William Henry and Martha as his children and their children as his grandchildren; and that he expected them to inherit his estate as the other children.

It is sometimes difficult to prove the fact of paternity. The act of cohabitation between a certain man and a certain woman is often difficult to prove. But where in a case like this the reputed father and the mother subsequently to the birth of twins marry, and the reputed father takes the wife and children into his own home and treats them as such, gives the children his own name, supports them and speaks of them as his children, and their children as his grandchildren, and gives the children money and one of them land of considerable value, etc., we think this is satisfactory, if not conclusive proof of such paternity. The law favors marriage, and likewise the legitimizing of children where it can be done with safety to society. See section 3012 of the Civil Code,

supra. Even in a criminal case, where stricter rules of evidence are applied than in a civil case where only a preponderance is necessary, it has been held, one Justice dissenting, that where a woman is on trial for adultery, and it is proved that she and the man named in the accusation were employed on a plantation, that there was only one cabin in which they could stay at night, that there was only one room and but one bed in the room, and that the defendant frequently slept in this room with the man, this evidence is sufficient to support a conviction, though the woman stated she was innocent and the man testified that he slept on a pallet, and had never had intercourse with her. *Eldridge* v. *State,* 97 *Ga.* 192 (23 S. E. 832), and see *Johnson* v. *State,* 119 *Ga.* 446 (46 S. E. 634). Even in prosecutions for adultery or fornication, or fornication and adultery, it is within the power of the persons charged with the offense to prevent or suspend the prosecution and punishment by marriage, if such marriage can be legally solemized. Penal Code of 1910, § 372.

In Stegall *v.* Stegall, Fed. Cas. No. 13,351 (2 Brock. 256), it is stated: "If a man marries a woman in such an advanced state of pregnancy that the situation of his wife must have been known to him, it must be considered as a recognition of the child, afterwards born, as his own; any conduct of the husband after the birth, indicating a belief that the child is his, is decisive." And in one of the decisions in the celebrated Myra Clark Gaines cases (Gaines *v.* New Orleans, 6 Wall, 642, 699 (18 L. ed. 950)), it was said by Justice Davis: "This case seems to have been defended on the idea that every presumption was against the legitimacy of Mrs. Gaines, and the inclination of courts would be so to decide. But as she was declared legitimate by her father in his last will and testament, common justice, not to speak of legal rules, would require that such a declaration should only be overborne by the strongest proof." The act of recognition in the Gaines case was in the will of the father. In the instant case the acts of recognition commenced when the twins were in infancy, and the father married the mother, gave the children his name, reared them in his home with his other children, gave them property and held them out as his children, and they were so recognized. And this continued, according to the evidence of the plaintiffs, for a long number of years, and until the death of the father, who reached the ripe old age of ninety years.

Applying the foregoing facts to the code section quoted, we think the court was abundantly justified in preserving the status of the property in litigation until a jury can pass upon the case under proper instructions from the court.

*Judgment affirmed. All the Justices concur.*