No. 35—Tattnall Booth, plaintiff in error vs. Jeremiah W. Williams, defendant in error.

[1.] Under the Acts of 1822, and 1823, to prevent the fraudulent enforcement of dormant judgments and executions, a return must be made by the proper officer on such execution every seven years, or it will be presumed to have been satisfied, and fraudulently kept open.

Dormant Judgments, &c.  From Houston Superior Court. Judge Floyd presiding.  October Term, 1846.

For the circumstances, see the decision of the Supreme Court.

King, for plaintiff in error.

H. Cobb, of Houston, for defendant in error.

By the Court—Warner, J. delivering the opinion.

This case comes before us on a bill of exceptions and writ of error from the Superior Court of the County of Houston.

It apppears from the record, that a judgment was obtained in the Superior Court of Jones County, in favour of Tattnall Booth, against Jeremiah M. Williams, on the 30th day of October, 1824. On the 20th day of January, 1825, the Deputy Sheriff made a return thereon of "no property to be found." On the 2d day of August, 1829, there was another return made on the execution, by the proper officer, of "no property to be found, whereon to levy this *fi. fa.*" There was no other entry made on it until the first of November, 1846, a period of more than seventeen years. The question made in the Court below was, whether this execution was *dormant* within the provisions of the Acts of 1822 and 1823.

The Court below decided that the execution was dormant, within the true intent and meaning of those Acts, and that an entry should be made by the proper officer every seven years; and that an entry made on the execution within seven years from the date of the judgment, was not sufficient to keep it alive. To which decision the plaintiff in error excepted, and now assigns the same for error in this Court.

By the common law, executions were required to be sued out within a year and a day after entering the judgment, otherwise the

Courts held, *prima facie*, that the judgment was satisfied and extinct. 3 *Black. Com.* 421. The common law was altered in this particular by the 31st section of the Judiciary Act of 1799. That Act declared " executions should be of full force *until satisfied*, without the same being obliged to be renewed on the Court roll, from year to year, as heretofore practised." *Marbury & Crawford's Dig.* 301. In 1811 the Legislature made the same declaration. *Prince,* 436.

As the law stood up to the time of the enactment of the [1.] Statute of 1822, there was no limitation to executions until they were *satisfied.* This was considered an evil, and productive of fraud; the caption of the Act of 1822 is to "*prevent a fraudulent enforcement of dormant judgments.*" The preamble to that Act recites, that " dormant judgments, by being collusively kept open, are made the instruments of fraud on innocent purchasers, and often operate oppressively on vigilant and *bona fide* creditors." The third section of the Act of 1822 declares, "that all judgments that have or may be rendered in any of the courts of this State, on which no execution shall be sued out, or on which no return shall be made on the execution within seven years from the date of the judgment, shall be void and of no effect." *Dawson's Compilation,* 209. This Act of 1822 was amended by the Act of 22d December, 1823, the caption of which latter Act declares it to be " to prevent a fraudulent enforcement of dormant judgments." The first section of the Act of 1823 enacts, " that all judgments that have been obtained since the said 19th day of December, 1822, and all judgments that may be hereafter rendered in any of the courts of this State, on which no execution shall be sued out, or which executions if sued out, no return shall be made by the proper officer for executing and returning the same, within seven years from the date of the judgment, shall be void and of no effect: Provided that nothing in this Act contained shall prevent the plaintiff or plaintiffs in such judgments, from renewing the same after the expiration of said seven years, in cases where by law he or they would otherwise be entitled to do so; but the lien of such revived judgments, on the property of the defendants thereto, shall operate only from the time of such revival." *Dawson's Compilation,* 214.

The plaintiff in error contends that the entry made on the execution by the proper officer, on the 2d August, 1829, (the same being made within seven years from the date of the judgment) is a compliance with the statute, and will keep the execution alive

for any indefinite length of time, until the same is satisfied. One of the fundamental common law rules for the construction of remedial statutes is, to consider the old law, the mischief, and the remedy; and it is the business of the Judges so to construe the statute, as to suppress the mischief and advance the remedy. 1 *Black. Com.* 87. Furthermore, statutes against *frauds* are to be *liberally* and *beneficially* expounded. *Ibid* 88. By the old law as it stood at the time of the enactment of this statute, executions remained open until satisfied. This was considered an evil. After a year and a day, as we have seen by the common law, the execution was presumed to be satisfied and extinct. The Legislature intended to fix a period after which the execution, when there had been no entry by the proper officer, should be presumed to be satisfied and extinct, to prevent frauds on innocent purchasers, and vigilant *bona fide* creditors. As the old law stood, a judgment might be obtained and no execution issue thereon, or if issued, no action had with it against the defendant for years, who might be in the possession of ample property to satisfy it, which property would give him credit, and contracts would be made on the faith of it; but when the *bona fide* creditor instituted suit on his demand obtained judgment and execution, and proceeded to sell the property, the old execution lying dormant for years would suddenly spring into action and sweep away the money, or an honest purchaser of the property from the defendant, might be stript of his earnings for years by the sudden and unexpected appearance of the old execution, which had been dormant and concealed until witnesses were dead and removed, who could prove its satisfaction; the holder of it perhaps colluding with the defendant to subject the property of the honest purchaser, and defraud the *bona fide* and vigilant creditor. The Legislature intended to remedy this mischievous evil by requiring plaintiffs in judgments to issue their executions within seven years from the date of their judgments, and when issued, if they permitted them to lie dormant without being put in action within seven years from the date of the judgment, the same should be presumed to be *fraudulent*, collusively kept open and void. The mischief under the old law was, in permitting the executions to lie *dormant*, secretly kept in the pockets of the plaintiffs without ever permitting them to see the light of day, until some honest purchaser got possession of the defendant's property, or some *bona fide* creditor was about to enforce his demand, and then they would spring into active existence with as po-

tent energy as if they had never been satisfied with the money of the defendant, and collusively kept open by a secret understanding between himself and the plaintiff. But it is said the *letter* of the statute is complied with by having the entry made within the seven years from the date of the judgment, and then the execution may run forever without any other entry being made on it; the *one entry* gives it everlasting vitality, it may then sleep quietly in the pocket of the plaintiff, until the existence of such a paper shall have passed from the memory of the present generation and still be alive as a valid execution. This very execution appears to have quietly slumbered in the custody of its owner for more than seventeen years, but when money was raised from the sale of the defendant's property, and about to be distributed, the breath of life is desired to be given to it, that it may participate in the distribution. The plaintiff insists, notwithstanding it has slept so long, it is not dead; that the entry in 1829 imparted to it *everlasting* life and vigour. Such a construction of the act in our judgment, would defeat the very object of the statute. The intention of the legislature was to impose *a limitation* on executions which had remained dormant for seven years, to *prevent fraud.* The act declares in effect, if an execution shall remain dormant, and no return be made on it within seven years, it shall be presumed to have been paid and *fraudulently* kept open, and shall be void. Would not the same mischief exist which the legislature intended to remedy by permitting the execution to remain dormant for seven years *after the last entry*, as would exist, if it remained dormant for seven years from the date of the judgment? The mischief against which the act is directed, is, permitting the execution to remain *dormant for seven years*, without having a return made on it by the proper officer.

Are not the rights of innocent purchasers, and vigilant *bona fide* creditors, as much affected by an execution which has an entry made on it within seven years from the date of the judgment, and then permitted to remain dormant for seven years from the date of the last entry on it by the proper officer? Is it not a *dormant* execution, within the reason, spirit, and intention of the Legislature? Such an execution, in our judgment, is fully within the mischief contemplated by the Legislature in the enactment of the statute. Being a statute for the prevention of fraud, it ought to receive a *liberal construction*, such a construction as will suppress the mischief and advance the remedy which the Legislature intended

to apply; and that remedy is, to declare all such executions void which have no return made by the proper officer within seven years; not within seven years from the date of the judgment, but seven years from the date of the last entry. It was urged in the argument that we should be controlled by the *strict letter* of the statute. It is an ancient maxim of the law, that " he who sticks to the *letter* sticks to the *bark*." He gets the *shell* without the *kernel;* the *form* without the *substance.* " *Qui hæret in litera, hæret in cortice.*"

Blackstone gives a few instances in his Commentaries. When a law of Edward III forbade all ecclesiastical persons to purchase *provisions* at Rome, it might seem to prohibit the buying of grain, and other victuals; but when it was considered that the statute was made to repress the usurpations of the Papal See, and that the nominations to the benefices by the Pope were called *provisions,* it was held, that the restraint was intended to be laid on *such provisions only.*

So where a law enacted that whoever *drew blood* in the streets, should be punished with the utmost severity, it was held not to extend to the Surgeon who opened the vein of a person who fell down in the street with a fit.

Where there was a law that those who in a storm forsook the ship should forfeit all property therein, and that the ship and lading should belong entirely to those who staid in it, in a dangerous tempest all the mariners forsook the ship except only one *sick passenger*, who, by reason of his disease, was unable to get out and escape. By chance the ship came safe to port, the sick man kept possession, and claimed the benefit of the law. 1 *Black. Com.* 61. Now this sick man was within *the letter* of the law, but not within the reason or spirit of it. The reason for making the law was, to give encouragement to such as should venture their lives to save the vessel; but the sick passenger neither staid in the ship on that account, nor contributed any thing to its preservation. The *subject matter* of a statute, its *effects and consequences*, as well as the *reason* and *spirit* of it, are to be taken into consideration. The contemporaneous construction given to this statute by the Judges in Convention, was the same which we now give to it. *Stone* vs. *Head et al. Dudley's R.* 166. Did we entertain any doubts as to the construction to be given to this statute, we should very reluctantly overrule the construction given to it by the Judges in Convention, under which important rights to property may have vested, and which ought not to be disturbed upon *doubtful questions.* Let the judgment of the Court below be affirmed.