302 Ga. 253
FINAL COPY

S17A0767.  PATTON v. VANTERPOOL.

HUNSTEIN, Justice.

OCGA § 19-7-21 creates an "irrebuttable presumption" of legitimacy with respect to "[a]ll children born within wedlock or within the usual period of gestation thereafter who [were] conceived by means of *artificial insemination.*" (Emphasis supplied.)   This appeal presents the question of whether that irrebuttable presumption applies to children so conceived by means of *in vitro fertilization* ("IVF").  We conclude that it does not and reverse the judgment of the superior court.

In January 2014, after approximately three years of marriage, David Patton ("Appellant") filed a complaint for divorce against Jocelyn Vanterpool, M.D. ("Appellee").  During the pendency of the divorce, the parties consented to Appellee undergoing IVF treatment,[1] which would eventually utilize both

---

[1] The record suggests that Appellee wanted to have a child but could not undergo the procedure without Appellant's consent.

donor ova and donor sperm; on November 10, 2014, Appellee traveled to the Czech Republic for the IVF procedure. Four days later, on November 14, 2014, a final judgment and decree of divorce was entered in the divorce action. The divorce decree incorporated the parties' settlement agreement, which reflects that, at the time of the agreement, the parties neither had nor were expecting children produced of the marriage.

Approximately 29 weeks later, on June 6, 2015, Appellee gave birth as a result of the November 2014 IVF procedure. Appellee subsequently moved the superior court to set aside the decree of divorce, seeking to include the minor child in the divorce agreement; this motion was denied. Appellee thereafter instituted a paternity action against Appellant, alleging that he gave written, informed consent for IVF and that OCGA § 19-7-21 created an irrebuttable presumption of paternity; Appellee also sought child support. In response, Appellant argued that he did not meaningfully consent to IVF and that, even if he did, OCGA § 19-7-21 is unconstitutional. The trial court sided with Appellee, granting her summary judgment on the issue of paternity. In September 2016, this Court granted Appellant's application for discretionary appeal, asking the parties to address whether OCGA § 19-7-21 applies to

2

children conceived by means of IVF and, if so, whether OCGA § 19-7-21 is unconstitutional.[2]

We are tasked with interpreting the text of OCGA § 19-7-21 to discern whether the irrebuttable presumption created with respect to children conceived by means of "artificial insemination" extends to children conceived by IVF therapy.   "A statute draws its meaning, of course, from its text." (Citation omitted.)  Chan v. Ellis, 296 Ga. 838, 839 (770 SE2d 851) (2015).  Under our well-established rules of statutory construction, we

> presume that the General Assembly meant what it said and said what it meant.  To that end, we must afford the statutory text its "plain and ordinary meaning," we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.

(Citations and punctuation omitted.) Deal v. Coleman, 294 Ga. 170, 172-173 (751 SE2d 337) (2013).  Though we may review the "text of the provision in question and its context within the larger legal framework to discern the intent of the legislature in enacting it," Scott v. State, 299 Ga. 568, 571 (788 SE2d

---

[2] Because we conclude that the plain language of OCGA § 19-7-21 has no application here, we pretermit any consideration of the constitutionality of OCGA § 19-7-21.

468) (2016), where the statutory text is "clear and unambiguous," we attribute to the statute its plain meaning, and our search for statutory meaning ends. See Deal, 294 Ga. at 173. With these principles in mind, we begin our analysis, applying a de novo standard of review to the judgment of the trial court. Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt, 286 Ga. 731 (2) (691 SE2d 218) (2010).

OCGA § 19-7-21 concerns the parent-child relationship generally, stating as follows: "All children born within wedlock or within the usual period of gestation thereafter who have been conceived by means of artificial insemination are irrebuttably presumed legitimate if both spouses have consented in writing to the use and administration of artificial insemination." At issue here is the term "artificial insemination," which is not defined by statute.[3] Artificial insemination, which has been in use since the late eighteenth century and has been so named since the early nineteenth century, see Kara W. Swanson, Adultery By Doctor: Artificial Insemination, 1890-1945, 87 Chi.-Kent L. Rev. 591 (2012), has been consistently defined as the "introduction of semen into the

___

[3] There is no dispute that the child was born "within the usual period of gestation" following the marriage.

4

uterus or oviduct by other than natural means  . . . in order to increase the probability of conception."  Webster's Third International Dictionary 124 (1967).  See also Black's Medical Dictionary 65 (26th ed. 1965) (defining artificial insemination as "the introduction of semen into the vagina by artificial means"); Stedman's Medical Dictionary (28th ed.) (updated Nov. 2014) (defining artificial insemination as "introduction of semen into the vagina other than by coitus"); 59 AmJur2d Parent and Child § 7 ("Artificial insemination is the introduction of semen into the female reproductive tract by mechanical means in order to effect pregnancy without sexual intercourse."); 8 Attorneys Medical Advisor § 83:12 ("Artificial insemination . . . refers to the artificial injection of semen into the female's reproductive tract.").    Thus, as the procedure has been understood for over 150 years, see, e.g., J. Marion Sims, Clinical Notes on Uterine Surgery: With Special Reference to the Management of the Sterile Condition 372 (1866), artificial insemination involves the introduction of *semen* to the female reproductive tract to further the purpose of *in vivo*[4] fertilization of an ovum.  See <u>In re Baby Doe</u>, 353 SE2d 877, 878 (S.C.

---

[4] "In vivo" means to "take place in the body," while "in vitro" means "in glass" and refers to an artificial environment rather than the body.  Black's Law Dictionary

1987) ("Artificial insemination is the introduction of semen into the reproductive tract of a female by artificial means."). We conclude, given the history  and well-established meaning and use of the term "artificial insemination," that the term is not ambiguous as it is used in OCGA § 19-7-21.[5]

 We now must address whether artificial insemination includes IVF.

In vitro fertilization was first described in the 1970s, see Janet L. Dolgin, The Law Debates the Family: Reproductive Transformations, 7 Yale J. L. & Feminisim 37 (1995), and involves "[a] procedure [in] which an egg is fertilized

956 (10th ed. 2014).

[5] Appellee contends that this Court should adopt the reasoning of Maryland's highest court, which has concluded that the phrase "artificial insemination" is "ambiguous" because there are numerous ways in which artificial insemination may be accomplished.  See Sieglein v. Schmidt, 136 A3d 751, 759-761 (Md. 2016).  The Sieglein decision explains that sperm may be introduced via intrafollicular insemination (injecting semen directly into an ovarian follicle), intraperitoneal insemination (injecting semen into the peritoneal cavity), intratubal/intrafallopian insemination (injecting semen into the fallopian tube) or intrauterine insemination (injecting semen directly into the uterus).  Id. at 760, n. 13.  The Maryland court also noted that artificial insemination could be used with sperm from a spouse (homologous insemination), commonly known as Artificial Insemination by Husband ("AIH"), *or* from a donor (heterologous insemination), otherwise known as Artificial Insemination by Donor ("AID").

We cannot agree that a decades-old term is rendered ambiguous simply because the procedure may utilize donor sperm or various locations in the female reproductive tract; irrespective of the use of donor sperm or the location of injection, sperm is being introduced to the female reproductive tract for the purpose of encouraging *in vivo* fertilization.

6

outside a woman's body and then inserted into the womb for gestation." Black's Law Dictionary 956 (10th ed. 2014). See also Stedman's Medical Dictionary (28th ed.) (online database updated Nov. 2014) (describing IVF as "a process whereby (usually multiple) ova are placed in a medium to which sperm are added for fertilization, the zygote thus produced then being introduced into the uterus with the objective of full-term development"); Gale Encyclopedia of Medicine (2008) (Retrieved October 4, 2017 from https://medical-dictionary.thefreedictionary.com/in+vitro+fertilization) ("In vitro fertilization (IVF) is a procedure in which eggs (ova) from a woman's ovary are removed. They are fertilized with sperm in a laboratory procedure, and then the fertilized egg (embryo) is returned to the woman's uterus."); 8 Attorneys Medical Advisor § 83:14 ("In vitro fertilization (IVF) consists of . . . fertilization of the oocytes in the laboratory[ ] and the transfer of resultant embryos back to the woman's uterus."). Two of the primary stages of the IVF process involve the *fertilization* of the ovum *outside* the body and the subsequent transfer of that embryo into the recipient's uterus. See Marvin A. Milich, In Vitro Fertilization and Embryo Transfer: Medical Technology – Social Values = Legislative Solutions, 30 J. Fam. L. 875, 876 (1991/1992). To

summarize, while artificial insemination involves the introduction of sperm to the female reproductive tract to encourage fertilization, IVF involves implanting a fertilized egg into a female; though each procedure aims for pregnancy, the procedures are distinct, and we conclude that the term "artificial insemination" does not encompass IVF. Other courts have reached this same conclusion.[6] See Finley v. Astrue, 270 SW3d 849, 850 n. 2 (Ark. 2008) (recognizing a distinction between artificial insemination and IVF); In the Interest of O. G. M., 988 SW2d 473 (II) (C) (Tex. App. 1st Dist. 1999) (concluding that a statute regarding artificial insemination was inapplicable to case involving IVF).

We are unswayed by Appellee's argument that such a plain-language construction of OCGA § 19-7-21 is unnecessarily restrictive. While Georgia law favors legitimation, OCGA § 19-7-21 creates an *irrebuttable presumption*,

---

[6] In support of her position that "artificial insemination" encompasses "in vitro fertilization," Appellee points to In re Adoption of a Minor, 29 NE3d 830 (Mass. 2015), a decision out of the highest court in Massachusetts interpreting MGLA 46 § 4B, which is similar to OCGA § 19-7-21. That decision, however, along with others from that state, including Okoli v. Okoli, 963 NE2d 730 (Mass. Ct. App. 2012), simply conclude, without significant discussion or analysis, that, under MGLA 46 § 4B, the term "artificial insemination" encompasses IVF. See Okoli, 963 NE2d at 734-735 (equating conception through sexual intercourse, artificial insemination, and IVF because, in each scenario, the "volitional actions" of the putative father resulted in the creation of a child). We do not find these decisions persuasive.

which is generally disfavored in the law, see Vlandis v. Kline, 412 U. S. 441 (93 SCt 2230, 37 LE2d 63) (1973), and our interpretation maintains the bounds of the plain language of the statute. Further, the irrebuttable presumption of legitimacy in OCGA § 19-7-21 is an exception to the general rule, found in OCGA § 19-7-20 (b), that legitimacy may be disputed, and an expansive reading of OCGA § 19-7-21 would allow the exception to swallow the rule.[7]

Appellee also contends that when the General Assembly enacted OCGA § 19-7-21 in 1964, that body could not have conceived of the advent of IVF (and related medical advancements) and that a plain-language construction of OCGA § 19-7-21 is at odds with the plain purpose of the statute, which is to legitimate children born by means of reproductive technology. This argument, too, fails.

Although OCGA § 19-7-21 was enacted over 50 years ago — at a time when IVF and various assisted reproductive technologies were not yet developed — recent amendments to other portions of Title 19 make plain that the General Assembly is now well acquainted with the developments in

---

[7] Though Appellee may not establish legitimacy through OCGA § 19-7-21, we do not speak to whether Appellee may establish legal paternity through other means, such as OCGA § 19-7-20.

reproductive medicine. In May 2009, the General Assembly passed the "Domestic Relations — Guardian — Social Services — Options to Adoption Act," which amended Chapter 8 of Title 19 to address, among other things, the custody, relinquishment, and adoption of embryos. See Ga. L. 2009, pp. 800-803. OCGA § 19-8-40, which was created by the 2009 Act, defines both embryo and *embryo transfer*, which "means the medical procedure of physically placing an embryo into the uterus of a female." OCGA § 19-8-40 (3). As discussed above, "embryo transfer" is a key component of IVF, and the language employed in the definition of "embryo transfer" tracks the standard definition of IVF. See, e.g., Black's Law Dictionary 956 (10th ed. 2014) (defining IVF as "[a] procedure [in] which an egg is fertilized outside a woman's body and then inserted into the womb for gestation").[8]

We presume that, when the General Assembly passed the 2009 Act, it

---

[8] It appears that the General Assembly has been familiar with advances in reproductive technologies since as early as the late 1980s. In 1988, the Senate considered a bill that would have amended Chapter 7 of Title 19 to address, among other things, IVF. See SB 493 (1988 Session). In the 1995-1996 session, the House entertained similar legislation. See H.B. 1073 (1996 Session). Likewise, other portions of the 1964 Act have been amended since the development of IVF technology and continue to include the term "artificial insemination" without expansion. See OCGA § 31-10-9 (amended 2005); OCGA § 43-34-37 (amended 2010).

"'had full knowledge of the existing state of the law and enacted [the Act] with reference to it.'" (Citation omitted.) Fair v. State, 288 Ga. 244, 252 (702 SE2d 420) (2010). Thus, as late as 2009, the General Assembly was aware of the existing language of OCGA § 19-7-21 and was familiar with advances in reproductive technology, yet chose to leave the statute unchanged. Accordingly, this is not a case in which the General Assembly has failed to anticipate scientific and medical advancements, but, instead, the General Assembly has chosen not to act; we must, therefore, presume that OCGA § 19-7-21 remains the will of the legislature.[9]

Judgment reversed. Hines, C. J., Melton, P. J., Benham, Nahmias, Blackwell, Peterson, and Grant, JJ., concur. Presiding Judge Christopher J. McFadden dissents. Boggs, J., not participating.

---

[9] As we have said before, "courts cannot construe [statutes] to force an outcome that the legislature did not expressly authorize." Turner v. Ga. River Network, 297 Ga. 306, 308 (773 SE2d 706) (2015). To the extent that the dissent argues otherwise, it misunderstands OCGA § 1-3-1 and the nature of our role in interpreting statutes. In order to address the legitimacy of children conceived by means of various reproductive technologies other than artificial insemination, the General Assembly will need to act.

1

McFADDEN, Presiding Judge, dissenting.

OCGA § 19-7-21 contains a latent ambiguity. The ambiguity arose because the General Assembly failed to anticipate subsequent advances in medical technology when it described the class of children under the statute's protection. In resolving that ambiguity we are required to apply a rule that is in our current Code, was in our first Code, can be traced back to Blackstone's Commentaries on the Law of England, and so was part of the "common law and statutes of England in force prior to May 14, 1776 [that, in 1784,] were adopted in this [s]tate by statute." *Hannah v. State*, 212 Ga. 313, 321-322 (6) (92 SE2d 89) (1956) (citations omitted). Often called the "mischief rule," as Blackstone's Commentaries refer to "the old law, the mischief, and the remedy," see Charles M. Cork III, Reading Law in Georgia 6-8, http://ssrn.com/abstract=2520296 (2014), that rule is now codified at OCGA § 1-3-1 (a): "In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy. . . ."

That rule directs us to the conclusion that the intention of the General Assembly was to protect children like S., the child in this case. So I respectfully dissent.

1. *Resolution of the latent ambiguity in OCGA § 19-7-21 under OCGA § 1-3-1 (a).*

Georgia law has long recognized latent ambiguities. "[T]his court has approved Lord Bacon's definition of a latent ambiguity, as one which seems certain and without ambiguity for anything that appeareth upon the deed or instrument, but there is some collateral matter, outside of the deed, that breedeth the ambiguity." *Citizens & Southern Nat. Bank v. Clark*, 172 Ga. 625, 630 (158 SE 297) (1931) (citation and punctuation omitted). In interpretations of contracts, the possibility of latent ambiguities is recognized by statute. OCGA § 13-2-2 (1).

As for interpretations of statutes, our case law recognizes that sometimes "the facts of [a] case[ ] . . . reveal a latent ambiguity in the language of [a statute]." *Daugherty v. Norville Indus.*, 174 Ga. App. 89, 90 (329 SE2d 202) (1985). In such cases, "[o]ur duty is to consider the results and consequences of any proposed construction and, based upon the particular facts and circumstances of the case, not so construe a statute as will produce unreasonable or absurd consequences not contemplated by the legislature." Id. (citing *State v. Mulkey*, 252 Ga. 201, 204 (312 SE2d 601) (1984)). See *Randolph County v. Bantz*, 270 Ga. 66, 66-67 (508 SE2d 169) (1998) (rejecting Randolph County's argument that it could require its chief magistrate to perform, without compensation, the duties of a clerk of court because

3

the statute that entitled chief magistrates to additional compensation for such services applied only to counties not authorized by local law to hire a clerk, whereas Randolph County was authorized to hire a clerk but preferred to have its chief magistrate do the work for free); *Sirmans v. Sirmans*, 222 Ga. 202, 204 (149 SE2d 101) (1966) (trial court erred in dismissing answer and holding defendant to be in default; although, due to clerk's mistake in calculating costs, defendant did not pay full court costs to open default, it was not legislature's intent to deprive defendant of ability to present defense over "trifling mistake"); *Transworld Financing Corp. v. Coastal Tire and Container Repair*, 298 Ga. App. 286, 288-289 (1) (680 SE2d 143) (2009) (declining to construe term "called for," in law allowing repairman to charge storage fees for vehicles unless "called for" by owner, to extend to owner's "call" to promise to retrieve vehicle; preferring a "reasonable and sensible interpretation to carry out the legislative intent" over the "literal meaning" of the terms); *Gazan v. Heery*, 183 Ga. 30, 42-43 (187 SE 371) (1936) (local legislation requiring the chief judge of the municipal court of Savannah to have practiced law for five years or more held not to prevent the elevation of an associate judge of that court who had served for over ten years, but before that had practiced law for less than two years). See generally Cork, Reading Law in Georgia at 43-47 (discussing cases in which Georgia courts applied mischief rule to construe statutes with latent ambiguities and noting similarity of

other cases applying mischief rule in conjunction with absurdity doctrine).

Turning to the statute before us, OCGA § 19-7-21, it was enacted in 1964. In distinguishing the children who are under its protection from children who are not, it references only children conceived of artificial insemination, which is a type of assisted reproductive technology. Id. S. was conceived by means of in vitro fertilization, another type of assisted reproductive technology that was not developed until a decade later. The statute therefore contains a latent ambiguity: into which category does a child like S. fall? Is a child like S. under the statute's protection or not? The statute must be construed to resolve that latent ambiguity.

Our interpretation of statutes is guided by a series of statutes. The first of these, OCGA § 1-3-1, provides in part:

> (a) In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy. Grammatical errors shall not vitiate a law. A transposition of words and clauses may be resorted to when a sentence or clause is without meaning as it stands.
>
> (b) In all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter, which shall have the signification attached to them by experts in such trade or with reference to such subject matter.

. . .

5

OCGA § 1-3-1 directs us to perform two distinct inquiries. Subsection (a), as noted above, is our codification of the mischief rule; it directs us to find the intention of the General Assembly by examining "the old law, the evil, and the remedy." Subsection (b) directs our attention to the text, the words in the statute.

The textual analysis required by subsection (b) leads us only to the conclusion that, when the legislature enacted the statute before us, it failed to anticipate medical advances that would be made more than a decade later. But that should not be the end of our analysis. It has long been understood that the nature of our role in interpreting statutes requires more. "The very office of construction is to work out, from what is expressly said and done, what would have been said with regard to events not definitely before the minds of the parties, if those events had been considered." Oliver Wendell Holmes, Jr., The Common Law 237 (1881). "As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final." *Guiseppi v. Walling*, 144 F2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring), aff'd sub nom. *Gemsco, Inc. v. Walling*, 324 U. S. 244 (65 SCt 605, 89 LE 921) (1945).

The analysis required by subsection (a) clearly directs us to the conclusion that

S. does come under the protection of OCGA § 19-7-21. The old law was that a child's legitimacy or illegitimacy at birth turned on biological connection to the father. The evil, or mischief, arose from the fact that artificial insemination, like in vitro fertilization, could use donated sperm: a father therefore could consent to the procedure but later deny the child. The remedy was to authorize binding written consent from the father. S. was conceived of donated sperm. Before her conception, the parties executed a written consent to assure her legitimacy.

Construing OCGA § 19-7-21's reference to artificial insemination to encompass subsequently-developed methods of assisted reproductive technology is consistent with the way Georgia courts have applied the mischief rule in other cases. The Court of Appeals' decision in *Daugherty v. Norville Indus.*, supra, 174 Ga. App. 89, for example, construed a statute that required a party to pay court costs as a precondition for filing a new action after dismissing a prior lawsuit. The plaintiffs in the consolidated cases on appeal failed to pay court costs because the clerk's office erroneously told their attorney that no costs were due. Holding that it was not the intent of the legislature to deny such parties the ability to file their new actions under the statute, the court in *Daugherty* defined "costs" to exclude costs unknown to the party after a good faith inquiry. *Daugherty*, 174 Ga. App. at 91. Likewise, construing OCGA § 19-7-21 to protect S. involves defining "artificial insemination" to include

subsequently-developed forms of assisted reproductive technology.

The majority infers a contrary intent from the General Assembly's failure to amend OCGA § 19-7-21, and in particular from its failure to pass proposed legislation that would have done so. But while inferences about intent behind legislative inaction are no more categorically improper than inferences about the intent behind enacted legislation, inferences from inaction are inherently weaker. The legislative process is difficult by design. It requires an expediture of finite resources, time, energy, and political capital, to get a bill out of committee and onto the floor of both houses. So when an appellate court frustrates an imperfectly-expressed legislative intent, it is not a satisfactory answer that they can pass another bill. The necessary resources may no longer be available.

And an inference from inaction is particularly unpersuasive here. Before today OCGA § 19-7-21 had been cited in only two published Georgia opinions, one of them a dissent. *Brown v. Gadson*, 288 Ga. App. 323, 324, n. 2 (654 SE2d 179) (2007); *Noggle v. Arnold*, 177 Ga. App. 119, 121 (338 SE2d 763) (1985) (Beasley, J., dissenting). The facts that brought the statute before us today are so unusual that appellant's counsel wisely began his oral argument by telling us that he would not be able to explain the parties' motives. So other priorities or a failure of the issue to come to a legislator's attention are the most probable explanations of the General

Assembly's failure to update OCGA § 19-7-21.

The parties have not identified, and I can't think of, any policy reason for choosing to exclude children like S. from the protection of the statute. On the contrary, the law and policy in this state favor legitimating children. See *Miller v. Miller*, 258 Ga. 168, 169 (366 SE2d 682) (1988); *Harrison v. Odum*, 148 Ga. 489, 495 (96 SE 1038) (1918).

The majority's construction of the statute provides legitimacy to children conceived of one form of assisted reproductive technology but withholds it from children conceived of another. This reading does not take into account OCGA § 1-3-1's requirement that we examine "the old law, the evil, and the remedy." Under that requirement, we must construe the statute before us to extend its protection to S. and children like her. To hold otherwise would frustrate the manifest intention of the General Assembly.

2. *Status of OCGA § 1-3-1 (a).*

The analysis above presupposes that OCGA § 1-3-1 (a) is still good law — that it still means what is says and says what it means. A casual observer might think it self-evident that OCGA § 1-3-1 (a) is still good law. Its roots are extraordinarily deep, and we have not struck it down.

But that proposition is no longer self-evident. Nationally, the mischief rule has

become controversial. It is condemned in a popular and influential treatise under the general heading, "Thirteen Falsities Exposed," and under the topic heading, "The false notion that the purpose of interpretation is to discover intent." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 341, 391 (2012).

That characterization is audacious. Other treatises often suggest that a case or line of cases is wrongly decided or identify the author's preference among conflicting lines of cases. It is one thing for a treatise to be, as Reading Law declares itself, "unapologetically normative." Scalia & Garner, Reading Law at 9. But it is something else entirely to declare that duly enacted statutes and case law binding within its jurisdiction are not law. Reading Law can be read to imply that such statutes and case law should simply be ignored.

This Court does, of course, have the power to strike down OCGA § 1-3-1 (a). And Reading Law suggests that it would be appropriate for us to do so on the basis that such statutes are invasions of the province of the judiciary. Scalia & Garner, Reading Law at 43-44, 244-245. But "[e]ach state, the District of Columbia, and the United States have a set of laws directing interpreters as to how the legislature wishes its statutes to be construed." Scott, "Codified Canons and the Common Law of Interpretation," 98 Geo. L.J. 341, 350 (II) (2010) (citations omitted). As noted above and detailed below, the Georgia statutes setting out the mischief rule are codifications

10

of common law. And in the last few years this Court has repeatedly embraced our General Assembly's instruction that in construing our new Evidence Code, we follow Eleventh Circuit precedent. See, e.g., *Parker v. State*, 296 Ga. 586, 592 (3) (a) (769 SE2d 329) (2015).

As for the merits of the mischief rule, Reading Law argues it is a falsity because its foundation is unsound. Reading Law makes some cogent arguments about the perils and possible excesses of inquiries into legislative intent. But its central argument is that the very idea of intention of a legislature — as well as of parties to a contract — is incoherent, that a search for legislative intention is a "search for the nonexistent." Scalia & Garner, Reading Law at 394.

To make this point, Reading Law offers a hypothetical about contract construction. Reading Law describes negotiations over a contract clause setting a deadline: one side prefers forty-five days; the other prefers five; they compromise on "a reasonable time." Scalia & Garner, Reading Law at 391. According to Reading Law, "The lawyer on one side privately told the client that a court would probably say that 30 days would be commercially reasonable; the other lawyer privately told the client that a court would probably say that 48 hours would be commercially reasonable (a week at the outside)." Id. at 391-392. This, we are told, illustrates the proposition that the idea of the necessity of a meeting of the minds is a "myth." Id.

11

at 392.

I question the soundness of this argument. The imagined advice would be unsound. The hypothetical parties compromised on — their minds met on — an indeterminate deadline. Each would be free to argue; neither could be sure of the outcome. More fundamentally, Reading Law's argument conflates the parties' negotiating objectives with their eventual agreement.

Regardless of the soundness of that argument, the more salient question is whether Reading Law's conclusion can be reconciled with the Georgia law we are duty-bound to administer. It cannot. Georgia law differs in a number of respects from Reading Law's prescriptions. See Cork, Reading Law in Georgia at 18 (detailing those differences and identifying as among the most prominent, Reading Law's rejection of legislative intent and its narrow version of the absurdity doctrine). Indeed, for contracts (the specific subject of the above hypothetical), our General Assembly has embraced the idea of intention even more emphatically than for statutes. In the interpretation of contracts, OCGA § 13-2-3 declares, "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." See also OCGA § 13-2-2 (rules of interpretation of contracts, referring

12

three times to the parties' "intention" or "intended" meaning); § 13-2-4 (addressing intention of one party known to the other).

Westlaw searches indicate that OCGA § 1-3-1 (a), OCGA § 13-2-3, or the principle set out in those Code sections has been cited hundreds, if not thousands, of times by this Court and by our Court of Appeals.[10] Very often the authority cited for the mischief rule is case law rather than statutes. See, e.g., *Cox v. Fowler*, 279 Ga. 501, 502 (614 SE2d 59) (2005) (citing *Carringer v. Rodgers*, 279 Ga. 359, 363 (578 SE2d 841) (2003) for the proposition that "[t]he cardinal rule in construing a legislative act, is to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose") (punctuation omitted); *TermNet Merchant Svcs. v. Phillips*, 277 Ga. 342, 344 (1) (588 SE2d 745) (2003) (citing *Gen. Elec. Credit Corp. v. Brooks*, 242 Ga. 109, 112 (249 SE2d 596) (1978) for the proposition that "[w]hen construing statutory phrases, of course, we look diligently for the General Assembly's intention, bearing in mind relevant old laws, evils sought to be addressed and remedies interposed"); *Holcim (US), Inc. v. AMDG, Inc.*, 265 Ga. App. 818, 820 (596 SE2d 197) (2004) (citing *Nguyen v. Talisman Roswell, LLC*, 262 Ga. App. 480, 482 (585 SE2d 911)

---

[10] A Westlaw search for "legislature," "legislative," "General Assembly," or "parties" in the same sentence as "intent" or "intended" brings up over 9,500 cases.

(2003) for the proposition that "[t]he cardinal rule of contract construction is to ascertain the intention of the parties") (punctuation omitted); *Seaboard Coast Line R. Co. v. Blackmon*, 129 Ga. App. 342, 344 (199 SE2d 581) (1973) (citing *Barrett & Caswell v. Pulliam*, 77 Ga. 552, 554 (1886) and *Jenkins v. State*, 93 Ga. App. 630 (92 SE2d 43) (1956) for the proposition that in interpreting legislative acts, "the courts shall look diligently for the intention of the General Assembly keeping in view at all times the old law, the evil and the remedy").

The statutes that direct us to consider the intention of the legislature and of the parties to a contract were in the first Georgia Code. Current OCGA § 1-3-1 (a) was Section 5 of the Code of 1863. Current OCGA § 13-2-3 was Section 2719 of that Code. And the mischief rule is older still. A few years after that first Code was adopted, this Court wrote: "The Code directs that statutes be construed with reference to the intention of the legislature, and that the old law, the mischief and the remedy, be considered to arrive at that intention (Code, § 4, par. 9); and such was the rule long before there was any code of laws compiled for this state." *Everett v. Planters' Bank*, 61 Ga. 38, 41 (1878). See also *Forman v. Troup*, 30 Ga. 496, 498-499 (1860) ("[O]ur Act of 1854 seems to me conclusive. Look at [the statute in question] by the old rule of construction — the old law — the mischief and the remedy.").

Indeed, the line of Georgia authority for the mischief rule stretches back to

14

Blackstone's Commentaries on the Laws of England and so, as noted above, the mischief rule was a part of the deposit of English common law on which the law of this state was founded. (The rule did not originate with Blackstone; its first appearance was apparently in *Heydon's Case*, 3 Co Rep 7a, 76 ER 637 (1584).)

The mischief rule's earliest recorded appearance in Georgia law was in the second volume of the Georgia Reports. *Booth v. Williams*, 2 Ga. 252 (1847). There we held, "One of the fundamental common law rules for the construction of remedial statutes is, to consider the old law, the mischief, and the remedy; and it is the business of the Judges so to construe the statute, as to suppress the mischief and advance the remedy. 1 Black. Com. 87." Id. at 254. See also *Persons v. Hight*, 4 Ga. 474, 501 (1848) (Warner, J., dissenting) ("'There are three points,' says Blackstone, 'to be considered in the construction of all remedial statutes; the old law, the mischief, and the remedy; that is, how the old law stood at the making the Act; what the mischief was for which the Common Law did not provide; and what remedy the Legislature hath provided to cure this mischief. And it is the business of the Judge so to construe the Act as to suppress the mischief and advance the remedy.' 1 Bl. Com. 87.") (emphasis omitted).

But the mischief rule became settled law in Georgia only after vigorous debate. Less than six months after our opinion in *Booth*, Justice Lumpkin criticized the

mischief rule in *Ezekiel v. Dixon*, 3 Ga. 146 (1847), stating that he "never can subscribe" to a doctrine authorizing judges to give statutes "such construction as will not only carry out the mind of the makers, but even to apply the rule to cases which, it is admitted, they did not contemplate, but which, it is supposed, the lawgiver would have provided for, if he had seen fully the mischief and the remedy." Id. at 152. But by 1856, Justice Lumpkin had yielded, albeit reluctantly, to the mischief rule. "I never yielded more reluctantly to any judgment pronounced by this Court, than that of *Booth vs. Williams*," he wrote; and he went on to make a more general point, "believing it to be the first duty of a Judge, as it is of every good citizen, to yield to authority, I surrendered my individual opinion, especially as the question involved was the construction of a Statute which had been acted upon so long." *Worthy v. Lowry*, 19 Ga. 517, 519 (1856).

Seven years later the rule was codified in what is now OCGA § 1-3-1.

For the next century-and-a-half the mischief rule was settled law, albeit cautiously applied. For example in 1914 we wrote:

> Seeking secret legislative meanings at variance with the language used is a perilous undertaking which is quite as apt to lead to an amendment of the law by judicial construction as it is to arrive at the actual thought in the legislative mind. 25 R. C. L. 961, § 217. But where an ambiguity exists either because of uncertainty in the meaning of words, conflicts with previous laws, or conflicts between different

16

clauses in the same statute, courts should look beyond the verbiage and discover the intent. While all parts of the statute should be preserved, yet a cardinal rule of construction is that the legislative intent shall be effectuated, even though some verbiage may have to be eliminated. The legislative intent will prevail over the literal import of the words.

*Carroll v. Ragsdale*, 192 Ga. 118, 120 (15 SE2d 210) (1914) (citing *American Security & Trust Co. v. Commrs. of District of Columbia*, 224 U. S. 491 (32 SCt 553, 56 LE 856) (1912); *Pickett v. United States*, 216 U. S. 456 (30 SCt 265, 54 LE 566) (1910); *United States v. Farenholt*, 206 U. S. 226 (27 SCt 629, 51 LE 1036) (1907); *Washington v. Atlantic Coast Line R. Co.*, 136 Ga. 638 (71 SE 1066) (1911); *Youmans v. State*, 7 Ga. App. 101 (66 SE 383) (1909); *State v. Pay*, 146 P 300 (Utah 1915)). We continued, "The statute must be examined as a whole, and its different provisions reconciled if possible." *Carroll*, 192 Ga. at 121 (citing *Cairo Banking Co. v. Ponder*, 131 Ga. 708 (63 SE 218) (1908); *Roberts v. State*, 4 Ga. App. 207 (60 SE 1082) (1908); *State v. Burnett*, 91 SE 597) (N.C. 1917); *Bd. of Supervisors v. Cox*, 156 SE 755 (Va. 1931); *Moss Iron Works v. County Court*, 109 SE 343 (W. Va. 1921)). We went on to hold, "The general scheme and purpose of the legislation is a proper criterion for the construction thereof." *Carroll*, 192 Ga. at 121 (citing *Singleton v. Close*, 130 Ga. 716 (61 SE 722) (1908); *Pennington & Evans v. Douglas, Augusta & Gulf R. Co.*, 3 Ga. App. 665 (60 SE 485) (1908)).

And in 1936, we wrote:

> Though we distinctly disavow any intention to place our decision upon the spirit of the law — for we are endeavoring to confine ourselves to the proper construction of the letter of the law [at issue] considered as a whole[ ] — still there are cases in which the following language taken from Plowden's Commentaries has been properly applicable: "It is not the words of the law, but the internal sense of it, that makes the law; and our law consists of two parts, viz., of body and soul; the letter of the law is the body of the law, and the sense and reason of the law are the soul of the law, quia ratio legis est anima legis. And the law may be resembled to a nut, which has a shell and a kernel within; the letter of the law represents the shell, and the sense of it the kernel; and as you will be no better for the nut if you make use only of the shell, so you will receive no benefit from the law if you rely upon the letter; and as the fruit and profit of the nut lie in the kernel and not in the shell, so the fruit and profit of the law consist in the sense more than in the letter. And it often happens, that when you know the letter, you know not the sense, for sometimes the sense is more confined than the letter, and sometimes it is more large and extensive."

*Gazan v. Heery*, supra, 183 Ga. at 41-42 (punctuation omitted).

In addition to Plowden's metaphor of a nut, we have adopted Justice Oliver Wendell Holmes's less terrestrial metaphor: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U. S. 418, 425 (38 SCt 158, 62 LE 372) (1918) (citation omitted), quoted in *Everitt*

18

*v. LaSpeyre*, 195 Ga. 377, 379 (24 SE2d 381) (1943) and *Robbins v. Vanbrackle*, 267 Ga. 871, 872 (485 SE2d 468) (1997) (Carley, J., dissenting). What both metaphors illustrate is that the words used to express an idea are intertwined with that idea, but distinct from it. So the words used to express an idea sometimes, and perhaps always, do so imperfectly.

But Justice Lumpkin was not compelled to surrender his individual opinions. And neither are we. We do not have the authority to ignore the law of this state. But we have the power to change it. We can adopt Chief Judge Dillard's concurring opinion in *Bellsouth Telecommunications, LLC v. Cobb County*, 342 Ga. App. 323, 334 (1) n. 16 (802 SE2d 686) (2017) (Dillard, P. J., concurring):

> [O]ur appellate courts should stop referencing altogether the ethereal fiction of "legislative intent" in the context of statutory interpretation. A judge should not care about what any legislator intended but did not expressly provide for in the statutory text. . . . [T]he General Assembly can no more tell the judiciary how to generally interpret the law than we can direct them how to legislate.

(Emphasis omitted.) So we can strike down the statutes that adopt the mischief rule. We can strike down the ones that embrace the idea of intent of the parties to a contract. And, with the stroke of a pen, we can disapprove every one of the hundreds, if not  thousands of Georgia cases that hold with those statutes. All that we can do.

But before we do, what else might fall should give us pause. The roots of that rule and of that idea run deep and wide. It is difficult to foresee, for example, the consequences of undermining every contract case that references intent or meeting of the minds. And undermining the contract and statutory construction cases that reference intent may have implications for trust and estate law in which intent is central. See OCGA § 53-4-55.

Rather than grasp that nettle, we have taken an indirect course. Consistent with Reading Law's declaration that invocations of the mischief rule are not law, but merely repetitions of a false notion, our recent opinions have instead undermined OCGA § 1-3-1 (a). Those opinions suggest that the mischief rule has never been a part of our law:

> But "the legislature's intent is discerned from the text of a duly enacted statute and the statute's context within the larger legal framework." State v. Riggs, 301 Ga. 63, 67 (2) (799 SE2d 770) (2017). "[W]hen judges start discussing not the meaning of the statutes the legislature actually enacted, as determined from the text of those laws, but rather the unexpressed 'spirit' or 'reason' of the legislation, and the need to make sure the law does not cause unreasonable consequences, we venture into dangerously undemocratic, unfair, and impractical territory." *Merritt v. State*, 286 Ga. 650, 656 (630 SE2d 835) (2010) (Nahmias, J., concurring specially) (punctuation omitted). See also *Malphurs v. State*, 336 Ga. App. 867, 871-872 (785 SE2d 414) (2016) ("[O]ur concern is with the actual text of statutes, not the subjective

20

statements of individual legislators expressing their personal intent in voting for or against a bill"); *Walters v. State*, 335 Ga. App. 12, 15 n. 3 (780 SE2d 720) (2015); *Day v. Floyd County. Bd. of Edc.*, 333 Ga. App. 144, 150-151 (775 SE2d 622) (2015) (Dillard, J., concurring fully and specially); *Rutter v. Rutter*, 316 Ga. App. 894, 896 (1) n.5 (730 SE2d 626) (2012); *Keaton v. State*, 331 Ga. App. 14, 26 n.17 (714 SE2d 693) (2011) (Blackwell, J., concurring in part and dissenting in part).

*Gibson v. Gibson*, 301 Ga. 622, 631-632 (3) (c) (801 SE2d 40) (2017) (footnote omitted). See also *Bellsouth Telecommunications, LLC*, 342 Ga. App. at 334 (1) n. 16 (Dillard, P. J., concurring); *State v. Riggs*, 301 Ga. 63, 67 (2) n. 6 (799 SE2d 770) (2017).

In taking that indirect course we have suggested that one can reconcile OCGA § 1-3-1 (a) with the undertaking in *Gibson*, supra, and the other recent cases in its line to narrowly confine the scope of consideration of the intention of the General Assembly. See also *Bellsouth Telecommunications, LLC*, 342 Ga. App. at 334 (1) n. 16 (Dillard, P. J., concurring) ("I realize, of course, that OCGA § 1-3-1 (a) provides that 'in all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy,' but this statutory directive must be read in conjunction with OCGA § 1-3-1 (b), which provides that 'in all interpretations of statutes, the ordinary signification shall be applied to all words.'") (punctuation omitted). That reading of OCGA § 1-3-1

21

(a) violates the principles of textualism to advance the cause of textualism. The only fair reading of OCGA § 1-3-1 (a) is that it is a codification of the mischief rule.

The only fair reading of *Gibson* and the similar cases it cites is that the mischief rule has been quietly excised from our law, that we no longer inquire into "the old law, the evil, and the remedy," and that while OCGA § 1-3-1 (a) is still on the books, it is a dead letter. That is not how we should operate. We should either strike down OCGA § 1-3-1 (a), as well as the statutes that enforce the intent of parties to a contract, and let fall all that must fall with them — or we should faithfully administer them.

I would faithfully administer them — albeit with the perils and temptations of such analysis firmly in mind. Administering OCGA § 1-3-1 (a) here requires us to construe OCGA § 19-7-21 so that S. comes under its protection. So I would affirm.

Decided October 16, 2017.

OCGA § 19-7-21. Chatham Superior Court. Before Judge Bass.

Andrews & Sanders Law Offices, Richard A. Sanders, Jr., for appellant.

The Manely Firm, Michael E. Manely, David B. Purvis, for appellee.