**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 31, 2024**

# In the Court of Appeals of Georgia

A24A0634. EQUITY PRIME MORTGAGE, LLC v. GREENE FOR CONGRESS, INC. et al

PIPKIN, Judge.

In this case, which has previously appeared before this Court, see *Equity Prime Mortgage v. Greene for Congress*, 366 Ga. App. 207 (880 SE2d 642) (2022) ("*Equity Prime I*"), the Fulton County Superior Court has again dismissed the complaint filed by Appellant Equity Prime Mortgage ("EPM") against Appellees Marjorie Taylor Greene and Greene for Congress (collectively "Greene") on the grounds that the action runs afoul of Georgia's anti-Strategic Lawsuits Against Public Participation ("anti-SLAPP") statute, see OCGA § 9-11-11.1. EPM now appeals. As explained below, the trial court erred in concluding that the entirety of Greene's speech was non-actionable opinion as a matter of law and, additionally, abused its discretion in failing

to grant limited discovery to EPM on the issue of malice. Further, there are remaining elements of defamation that the parties and the trial court have left unaddressed, and we decline to consider them in the first instance on appeal. Accordingly, the judgment of the trial court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*I. Facts and Procedural History*

"T[his] action stems from Greene's social media posts and political advertisements made in connection with EPM's June 2020 firing of Melissa Rolfe ('Rolfe')." *Equity Prime I*, 366 Ga. App. at 207. As we explained in our previous opinion, and as relevant here,

> Rolfe[1] began working for EPM as a Human Resources Director in February 2020. On June 12, 2020, Rolfe's stepson, Garrett, while employed as police officer in Atlanta, was involved in a shooting that resulted in the death of Rayshard Brooks; a few days later, Garrett was charged with numerous offenses, including felony murder. While EPM initially sent supportive messages to Rolfe and granted her eight weeks of paid leave to deal with the fallout from the incident, EPM terminated Rolfe's employment in a brief telephone call on June 18, 2020, the day after the charges against Garrett were announced. There is no dispute that, during that telephone call, Rolfe did not ask why she was being fired,

---

[1] Melissa Rolfe is a party to the action but is not a party to this appeal. This opinion includes reference to Rolfe's son, Garrett, but all references to "Rolfe" here mean only Melissa Rolfe.

and EPM did not provide a reason. . . Greene, [who] was [then] a congressional candidate . . . took to social media to voice her support for Garrett and his stepmother. After learning of Rolfe's firing, Greene posted the following message on social media:

> I am praying for my friend Melissa Rolfe and her family. First, her step son (who was acting in self defense) lost his job [and] was charged with murder! Then[,] Melissa's employer caved to the mob and wrongfully fired her! The war on our police officers and their families must end!

Shortly thereafter, Greene also posted the following:

> Officer Rolfe's stepmother, Melissa, has been fired from her job and been treated very unfairly. As Northwest Georgia's next Congresswoman, she will be one of my constituents.

. . . . [A]fter the news of Rolfe's firing was publicized, EPM was "bombarded" with thousands of website hits,"furious messages," and threats; consequently, EPM issued a statement clarifying that Rolfe's employment was terminated because "she [had] violated company policy" and had created "a hostile working environment." . . . . [In the days and weeks that followed,] then-candidate Greene continued to reference Rolfe and Garrett on social media and in her campaign materials; she posted screenshots from television coverage of Rolfe's firing, commenting that "Garrett has been treated HORRIBLY" and that "Melissa herself lost her job as a result of this nonsense." Later, in connection with her campaign, Greene distributed a letter of support drafted by Rolfe in which Rolfe praises Greene and recounts losing her job the day after Garrett was charged.

(Footnote omitted.) *Equity Prime I*, 366 Ga. App. 208-209 (1). After Greene refused to

accede to EPM's demand that "she retract her statements about Rolfe's firing and

issue a public apology,'' EPM filed suit against Greene and others, asserting claims of defamation and false light invasion of privacy. Id. at 210. Greene thereafter answered and moved to dismiss or strike the complaint in accordance with the anti-SLAPP statute. In an October 2021 order, the Fulton County Superior Court granted Greene's motion; the October 2021 order concluded that Greene had demonstrated, in accordance with OCGA § 9-11-11.1, that her speech was a matter of public concern and, further, that EPM could not demonstrate a probability of success on its claims. *Equity Prime I*, 366 Ga. App. at 210 (1). EPM thereafter appealed. While we agreed with the trial court's conclusion that Greene's speech was a matter of public concern, we remanded the matter for the trial court to reevaluate whether EPM could establish a probability of success on its claims. *Equity Prime I*, 366 Ga. App. at 215 (2) (b).

On remand, the trial court issued a new, detailed order again concluding that EPM could not demonstrate a probability of prevailing on its claims. Specifically, the trial court concluded that EPM had not established that Greene's comments amounted to actionable defamation and, also, that EPM's evidence was not legally sufficient to support its claims because it was based, at least in part, on hearsay. The trial court also concluded that, even if EPM's claims were facially valid and supported with sufficient

4

evidence, the claims nevertheless failed as a matter of law because Greene's statements were conditionally privileged in accordance with OCGA § 51-5-7 (4) and because EPM had failed to produce evidence that would defeat that privilege. Finally, the trial court concluded that EPM was not entitled to discovery under the anti-SLAPP statute. EPM now challenges this order on appeal; we address those arguments below.

*II. EPM's Defamation Claim*

We first turn to the trial court's conclusion that EPM has not demonstrated a probability of success on its defamation claim.

In Georgia, a defamation claim has the following four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." (Citations and punctuation omitted.). *American Civil Liberties Union v. Zeh*, 312 Ga. 647, 650 (1) (b) (864 SE2d 422) (2021). The trial court's order concerned only the first and second elements of this claim, falsity and privilege. As explained below, we conclude the trial court erred in ruling that EPM could not demonstrate the falsity necessary to support a defamation claim and, also, that the trial court erred in denying

5

discovery to EPM on the question of malice as that issue pertains to the issue of privilege. The remaining elements remain unaddressed by the trial court and the parties, and they must be resolved by the trial court on remand before EPM is permitted to engage in discovery.

*(A) The Element of Falsity*

As to the first element, falsity, the trial court concluded that the entirety of Greene's statements were, as a matter of law, non-actionable opinion or rhetoric. This was error.

As the Supreme Court of Georgia has explained,

> a defamation action will lie only for a statement of fact. This is because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false. As a result, a plaintiff who claims that a published opinion defamed him will generally be unable to carry his burden of proving the essential element of falsity. Still, there is no wholesale defamation exception for anything that might be labeled opinion. An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false.

(Citation and punctuation omitted.) *Cottrell v. Smith*, 299 Ga. 517, 523 (II) (A) (788 SE2d 772) (2016). By way of example from the Supreme Court of the United States,

the statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

*Milkovich v. Lorain Journal Co.*, 497 U. S. 1, 20 n.7 (110 SCt 2695, 111 LE2d 1) (1990).

As to this example, we have explained that,

[w]hen examining whether a statement is actionable under the second level in the *Milkovich* [example], the pivotal questions are whether the challenged statement can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proven false.

(Footnotes and punctuation omitted.) *Bryant v. Cox Enterprises*, 311 Ga. App. 230, 235 (III) (715 SE2d 458) (2011). It is only where the meaning of a publication is so unambiguous as to bear only one reasonable interpretation that a court may decide the question as a matter of law. Id.

Here, the trial court concluded that Greene's statements -- namely that EPM "caved to the mob and wrongfully fired her" and that Rolfe "lost her job because of this nonsense" -- *must* be considered rhetorical statements or expressions of opinion because they merely relayed her "subjective opinion" as to Rolfe's firing. We disagree. While Greene used colorful and forceful language to express her displeasure with

7

Rolfe's firing -- and while that language may have been accompanied by other rhetoric -- the fact remains that her statements, like the example in *Milkovich*, can be understood to convey a multitude of messages: Greene's statements express not only an opinion on Rolfe's firing, but her statements also necessarily imply the reason for the firing. Indeed, Greene's opinion and the factual implication are nearly inseparable.

The evidence shows that Greene was not merely concerned that one of her potential constituents lost a job. Instead, in the context of Greene's flurry of social media posts supporting the "Back the Blue political movement," Greene's *opinion* that Rolfe's firing was "wrongful" and "unfair" undeniably implies -- and is indisputably linked to -- a *factual premise* of Rolfe's termination, namely, that it was connected with the shooting of Rayshard Brooks. Thus, Greene's statements may be reasonably interpreted to imply precisely what EPM alleges, again, that Rolfe was fired as a consequence of her connection to Garrett and his use of force as a police officer; this is a factual implication capable of being proven false. See *Thomason v. Times-Journal*, 190 Ga. App. 601, 602 (1) (379 SE2d 551) (1989) (recognizing that "a defamatory statement may be made in indirect terms or by insinuation" and that "a statement may

carry a defamatory meaning only by reason of extrinsic fact or circumstances by use of innuendo, inducement and colloquium") (punctuation omitted).

Our conclusion that Greene's statements may be reasonably construed as factual is bolstered by further examination of the context and circumstances of the statements: the record shows that Greene, who was at that time a congressional candidate, was clearly publishing written messages and information supplied from the fired employee herself -- indeed, some of the statements posted to social media are accompanied by a photo of then-candidate Greene with Rolfe -- and Greene was posting about the developments in both Garrett's criminal case and Rolfe's firing as they occurred.

Our decision in *Webster v. Wilkens*, 217 Ga. App. 194 (456 SE2d 699) (1995), the decision relied on by the trial court below, does not compel a different outcome here. In *Webster*, a newspaper published an article in which a professional basketball player described the mother of his child as "unfit to have a kid." Id. at 194. The mother subsequently sued both the newspaper and the father, asserting that the statement was an "assertion of objective fact which is capable of being proved false because her fitness as a parent could be determined by a court" in accordance with statutes concerning child welfare. Id. at 195 (1). Our Court in *Webster* concluded that the father's statement

could not be reasonably understood to mean that the mother was "an unfit parent as determined under Georgia law," but, instead, that the statement was only a "subjective opinion criticizing [her] parental abilities." Id. Comparing this case to *Webster*, the trial court concluded that the average reader would not believe that Greene was accusing EPM of "wrongful" firing in the legal sense, noting that Georgia is an "at-will employment state." However, the mere fact that a reader may not have believed that EPM's conduct was *unlawful* does not address the inquiry here. Instead, EPM has always alleged, at least in part, that its injury arose simply from Greene's allegation that Rolfe's firing was related to Garrett's killing of Rayshard Brooks; indeed, Greene's own pleadings characterize Rolfe's firing as "immoral" rather than unlawful.[2]

In summary as to the element of falsity, not all of Greene's statements were mere opinion or hyperbole; instead, some of those statements may be reasonably understood to imply defamatory facts about EPM that could be proven false, and the trial court erred in concluding that EPM could not demonstrate the falsity necessary to support a defamation claim. See *North Atlanta Golf Operations v. Ward*, 363 Ga. App.

---

[2] For this same reason, the trial court's reliance on *Greenbelt Cooperative Publishing Assn. v. Bresler*, 398 U. S. 6 (90 SCt 1537, 26 LE2d 6) (1970), which involved the use of the term "blackmail," is similarly misplaced.

259, 261-263 (2) (a) (1) (810 SE2d 814) (2022) (social media posts that were a mix of personal belief and assertions of fact were sufficient to support element of falsity in action for defamation); *Gettner v. Fitzgerald*, 297 Ga. App. 258, 261-262 (1) (a), (b) (677 SE2d 149) (2009) (published account of why professional was demoted from executive position could be proven false and, thus, was not merely a matter of opinion). Compare *Mathis v. Cannon*, 276 Ga. 16, 24–25 (573 SE2d 376) (2002) ("[A]ny person reading the postings on the message board -- written entirely in lower case replete with question marks, exclamation points, misspellings, abbreviations, and dashes -- could not reasonably interpret the incoherent messages as stating actual facts . . . but would interpret them as the late night rhetorical outbursts of an angry and frustrated person[.]").

*(B) The Element of Privilege*

We now turn to the question of whether Greene's statements were privileged. As we have explained,

> [s]ome statements, although defamatory, are not actionable because they are considered privileged. There are two types of privilege, absolute and conditional. Communications which are afforded an absolute privilege cannot form the basis of a defamation action, regardless of the falsity of the statements or the speaker's malicious intent; conditionally privileged statements, on the other hand, are actionable upon a showing of malice.

11

(Citations and punctuation omitted.) *Renton v. Watson*, 319 Ga. App. 896, 900 (2) (739 SE2d 19) (2013). Here, the trial court concluded that the entirety of Greene's statements are conditionally privileged under OCGA § 51-5-7 (4)[3] and that EPM had failed to make a showing of malice. Neither party challenges the trial court's initial determination that Greene's statements are, as a whole, conditionally privileged, so we assume that conclusion is correct and do not address it. See *Dagne v. Schroeder*, 336 Ga. App. 36, 41 (3) (783 SE2d 4265) (2016). Thus, our review of conditional privilege is limited to the question of malice.

*(i) Overcoming the Conditional Privilege with Evidence of Malice*

In this case, the resolution of the issue of privilege is intertwined with -- and in fact turns on -- our review of the trial court's exclusion of evidence submitted by EPM to support its claim of malice and, further, the trial court's ruling that EPM was not entitled to discovery on the issue of malice. We address each in turn.

---

[3] "Statements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in subsection (c) of Code Section 9-11-11.1."

*(a) The Exclusion of EPM's Evidence*

In support of its claims against Greene and to counter Greene's motion to dismiss under OCGA § 9-11-11.1, EPM submitted affidavits from three individuals, Eduardo G. Perez, Jr., James Minghini, and Daniel P. Watkins. Thereafter, Greene moved to strike large portions of the affidavits and exhibits on the basis that they were filled with hearsay, speculation, and not based on personal knowledge. EPM never responded to this motion, and there is no indication that EPM submitted revised affidavits or exhibits. On remand, the trial court granted Greene's motion, striking substantial portions from the Perez and Minghini affidavits, as well as certain exhibits attached to the Watkins affidavit.

EPM now challenges this ruling on appeal. However, as noted above, EPM failed to respond to this motion below, and the arguments presented by EPM on appeal are being raised for the first time. Thus, there is nothing for us to review. See, e.g., *Byrd v. Shelley*, 279 Ga. App. 886, 887 (1) (633 SE2d 56) (2006) (appellant could not attack exclusion of evidence for the first time on appeal). Moreover, EPM fails to argue -- let alone establish -- how any possible error in this regard was harmful. As the company acknowledges in their reply brief, "the stricken parts of th[e] affidavits speak primarily

to falsity, making them largely superfluous to EPM's actual malice case and this appeal."[4] In light of EPM's failure to demonstrate harm flowing from any possible error here, the company is not entitled to relief. See *Alligood v. Piedmont Med. Care Corp.*, 369 Ga. App. 171, 172 (1) (892 SE2d 790) (2023) ("An appellant must show harm as well as error to prevail on appeal; error to be reversible must be harmful.")(citation and punctuation omitted).

*(b) The Issue of Discovery on Malice*

On remand -- and before the trial court ruled -- EPM moved the trial court for discovery on the issue of malice, but the trial court ultimately denied the motion. As explained below, we agree with EPM that the trial court's interpretation of the relevant statutory authority was flawed and, additionally, that the trial court abused its discretion in denying discovery to EPM on the issue of malice.

Whether EPM is entitled to discovery is controlled by various sections of OCGA § 9-11-11.1. As we delve into this statute, we recognize that

---

[4] As EPM correctly asserts on appeal, the remaining portions of the relevant affidavits and letters may still be used to support both the company's claim of falsity and the company's position that Green was put on notice as to a possible alternative explanation for Rolfe's firing.

[a] statute draws its meaning, of course, from its text. Under our well-established rules of statutory construction, we presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. . . . [W]here the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning ends.

(Citations and punctuation omitted.) *Patton v. Vanterpool*, 302 Ga. 253, 254 (806 SE2d 493) (2017). With these ideas in mind, we turn to OCGA § 9-11-11.1.

Generally speaking, once a motion to dismiss or strike has been filed pursuant to Georgia's anti-SLAPP statute, "[a]ll discovery and any pending hearings or motions in the action shall be stayed . . . until a final decision on the motion." OCGA § 9-11-11.1 (d). However, "if there exists a claim that the nonmoving party is a public figure plaintiff, then the nonmoving party shall be entitled to discovery on the sole issue of actual malice whenever actual malice is relevant to the court's determination [of the anti-SLAPP motion]." OCGA § 9-11-11.1 (b) (2). Further still, OCGA § 9-11-11.1 (d) provides, in addition to *staying* discovery during the pendency of an anti-SLAPP motion, that "[t]he court, on noticed motion and for good cause shown, may order that

15

specified discovery or other hearings or motions be conducted notwithstanding this subsection."

Here, Greene initially asserted that EPM was a limited public figure, and EPM moved for discovery in accordance with the above-quoted portion of OCGA § 9-11-11.1 (b) (2). Greene thereafter withdrew her allegation that EPM was a limited public figure, and EPM subsequently moved the trial court for discovery pursuant to the good-cause provision in OCGA § 9-11-11.1 (d). In a three part decision, the trial court concluded that EPM was not entitled to discovery under OCGA § 9-11-11.1 (b) (2), that OCGA § 9-11-11.1 (d) did not provide an alternative means for malice discovery, and, finally, that, even if discovery were a matter of discretion, the trial court would decline to exercise such discretion.

On appeal, EPM does not challenge the trial court's ruling that the company was not entitled to discovery under OCGA § 9-11-11.1 (b) (2)[5] -- though that section

_____

[5] For reasons that are not immediately apparent, neither the trial court nor EPM addressed whether Greene, as a litigant, was authorized to unilaterally dictate whether the company could be considered a limited public figure for the purposes of this action or for determining the applicability of OCGA § 9-11-11.1 (b) (2). But see *Mathis*, 276 Ga. at 22 (2) ("Whether a person is a public figure is a question of law that requires the court to review the nature and extent of the individual's participation in the specific controversy that gave rise to the defamation."). In fact, there is little meaningful consideration in the materials before this Court concerning the "fault"

remains relevant to our resolution of this appeal -- and, so we address only whether malice-related discovery is allowed under OCGA § 9-11-11.1 (d) and, if so, whether the trial court abused its discretion in denying EPM's request.

*(1) The Trial Court's Construction of OCGA §§ 9-11-11.1 (b) (2) and (d)*

In a two-part ruling, the trial court decided that OCGA § 9-11-11.1 (d) does not permit discovery on the issue of malice as it relates to conditional privilege. In the first part of its ruling, the trial court concluded -- after examining the statute's revision history and applying the canon "inclusio unis, exclusio alterius" -- that the mention of malice discovery in OCGA § 9-11-11.1 (b) (2) "implies that . . . subsection (d) is not aimed at discovery on actual malice in cases outside the scope of (b) (2)." According to the trial court, "[a]ny other interpretation would have the catch-all language of subsection (d) swallow the limited scope of discovery permitted under subsection (b) (2)." In the second part of its ruling, the trial court applied "[t]he rule of ejusdem generis" to alternatively conclude that the good cause provision of OCGA § 9-11-11.1 (d) must "not be interpreted to override the legislature's specifically intended

_____

element of a defamation claim, namely, whether EPM is a private or public figure. Id. at 21 (2). On remand, the trial court must address the issue of "fault" as part of the third element of defamation.

17

limitation on when actual malice discovery is permitted [as] expressed in [OCGA § 9-11-11.1] (b) (2)." The trial court explained that any other reading of the good cause provision of OCGA § 9-11-11.1 (d) would "nullify" the limited allowance of discovery found in OCGA § 9-11-11.1 (b) (2).

We do not agree with the manner in which the trial court construed and applied OCGA §§ 9-11-11.1 (b) (2) and (d). As an initial matter, canons of statutory construction are only applicable where the text of a statute is ambiguous. See *McBrayer v. Scarbrough*, 317 Ga. 387, 393 (2) (c) (893 SE2d 660) (2023). There was no conclusion by the trial court -- or argument by either party -- that the statutes at issue are, in fact, ambiguous, and it was erroneous for the trial court to employ those canons of construction without first considering the plain language of the relevant statutory provisions. Further, the trial court's interpretation is unnecessarily strained. Statutes must "be read according to its natural and most obvious import of the language *without resorting to subtle and forced constructions* for the purpose of either limiting or extending its operation." (Punctuation and footnotes omitted; emphasis supplied.) *Najarian Capital v. Fed. Nat. Mtg. Assn.*, 354 Ga. App. 159, 162 (1) (840 SE2d 600) (2020).

Here, the natural and harmonious reading of OCGA §§ 9-11-11.1 (b) (2) and (d) is that discovery is generally stayed pending the resolution of an anti-SLAPP motion under OCGA § 9-11-11.1 (d), that a public-figure plaintiff is *entitled* to discovery when the issue of malice is germane to resolving the anti-SLAPP motion under OCGA § 9-11-11.1 (b) (2), and that *in all other circumstances*, discovery is permitted at the discretion of the trial court under OCGA § 9-11-11.1 (d). Indeed, the Supreme Court of Georgia has recently indicated that this is the proper reading of these two subsections. See *Zeh*, 312 Ga. at 674-676 (5) n.26 ("good cause" discovery under OCGA § 9-11-11.1 (d) available for plaintiff even where it is unclear if plaintiff qualifies for public-figure discovery under OCGA § 9-11-11.1 (b) (2)). The question now is whether EPM was entitled to "good cause" discovery under OCGA § 9-11-11.1 (d).

*(2) The Exercise of Discretion to Grant Discovery for Good Cause*

The trial court concluded that, even if OCGA § 9-11-11.1 (d) permitted discovery at the discretion of the trial court, there would be no such exercise of discretion. The trial court first reasoned that discovery was unwarranted because Greene's statements, as a whole, were "protected opinion and hyperbole." However, as explained above, we have reversed this portion of the trial court's order.

19

The trial court also concluded that EPM was not entitled to discovery because the company had failed to respond to Greene's motion to strike EPM's evidence, failed to "respond to [her] motion to dismiss with admissible evidence sufficient to substantiate a legally sufficient claim," and, finally, because Greene's evidence demonstrated that she had, at all times, acted in good faith. While EPM's failure to respond to Greene's motion to strike hearsay evidence is certainly concerning, the trial court does not explain -- and we cannot discern -- how EPM's failure to respond to that motion *or failure to produce evidence pertaining to the topic on which the company seeks discovery* merits denying EPM's motion for discovery. While both the trial court and Greene suggest that there is little evidence that Greene was initially aware that there may have been an alternative rationale for Rolfe's firing, there is evidence suggesting that Greene continued to make comments concerning Rolfe's firing even after having received EPM's demand letter; this letter, even with the hearsay statements removed, is evidence that Greene was on notice that the statements she was making about Rolfe's firing may not have been accurate. Thus, it is at least plausible that discovery may uncover evidence revealing Greene's motives in continuing to repeat her contentions about Rolfe's firing.

Given how crucial the issue of malice is here, and, because it does not appear "that the disallowed discovery would add nothing of substance to the [EPM's] claim," the trial court should have granted EPM's request for discovery on the issue of malice. (Citation and punctuation omitted.) *Zeh*, 312 Ga. 647, 674-676 (5). See also *Lafayette Morehouse v. Chronicle Publishing*, 37 Cal. App. 4th 855, 868 (II) (B) (3) (44 CalRptr2d 46) (1995).

In summary as to the element of privilege, there has been no challenge to the trial court's ruling that Greene's statements, as a whole, were conditionally privileged, and, consequently, the trial court's order is affirmed in that regard. Likewise, the trial court's order is affirmed to the extent that it struck certain portions of EPM's affidavits and accompanying exhibits. However, the trial court's construction of OCGA § 9-11-11.1 (d) was erroneous, and it is reversed; likewise, the trial court abused its discretion in failing to permit EPM to engage in discovery on the issue of malice.

*(C) The Remaining Elements of Defamation*

Left unaddressed by either the trial court or the parties are the third and fourth elements of defamation, namely, "(3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of

21

special harm." (Citations and punctuation omitted.). *Zeh*, 312 Ga. at 650 (1) (b). On remand, before EPM is permitted to engage in discovery, the trial court "must first determine whether EPM's complaint is sufficient [with respect to these elements] and then whether [they are] supported by a prima facie showing of facts that could support [each element]." *Equity Prime I*, 366 Ga. App. at 215 (2) (b).

### III. EPM's Claims for False Light Invasion of Privacy and Punitive Damages

In its final enumeration, EPM alleges that the trial court erred in dismissing the company's claim of false light invasion of privacy and its claim for punitive damages. According to EPM, the trial court "dismissed those claims on the premise that they couldn't survive dismissal of EPM's defamation claim."

As to the latter issue, EPM is correct that the trial court dismissed the claim for punitive damages because EPM's complaint against Greene was dismissed in its entirety. Given our resolution of this appeal, this portion of the trial court's order is also reversed.

That said, EPM mischaracterizes the trial court's dismissal of the claim for false light invasion of privacy. The court did not "dismiss[] th[e] claim on the premise that [it] couldn't survive dismissal of EPM's defamation claim," but, instead, dismissed the

claim because it was "duplicative of the defamation claim . . . because [the false light claim] relies upon the same allegedly false statements casting [EPM] in a false and offensive light." EPM has failed to challenge the actual legal basis of the trial court's ruling, and, consequently, it is due to be affirmed. See *Dagne*, 336 Ga. App. at 41 (3). Moreover, the trial court's ruling was sound. See *Bollea v. World Championship Wrestling*, 271 Ga. App. 555, 556 (1) n.1 (610 SE2d 92) (2005). Accordingly, this portion of the trial court's order is affirmed.

For the reasons detailed at length above, the trial court's September 2023 order is affirmed in part and reversed in part, and this case is remanded for proceedings consistent with this opinion.

*Judgment affirmed in part and reversed in part, and case remanded. Barnes, P. J., and Gobeil, J., concur.*